No. 12.—RAFE, (a slave,) plaintiff in error, *vs.* THE STATE OF GEORGIA.

[1.] The Statutes regulating the selection, drawing and summoning Jurors, are intended to distribute Jury duties amongst the citizens of the county, provide for rotation in Jury service, and to insure at each Court the attendance of persons to serve on Juries, and are no part of a regulation to secure to parties *impartial* Juries.

[2.] Persons belonging to the Grand Jury list, as selected by the officers of the county, are not disqualified nor excused from serving on Juries to try persons charged with offences against the laws, provided they are not sworn on the Grand Jury for the term of the Court at which the trial takes place, and have other Statutory qualifications.

[3.] The 34th sec. of the 14th div. of the Penal Code, has no reference to the law in relation to Jurors. It has relation to the offence for the commission of which the person is indicted.

[4.] The trial by Jury, as it was used in Georgia, prior to the adoption of the Constitution of 1798, is not infringed by the provisions of the Act of 1856.

[5.] Confessions voluntarily made, and not elicited by promises or threats, are admissible as evidence.

Murder, in Liberty Superior Court. Tried before Judge FLEMING, April Term, 1856.

The prisoner in this case challenged the array upon the following grounds—

1st. That said Jury has not been drawn from the apartment of the Jury Box marked No. 3, as prescribed by the Judiciary Act of 1799 : the Justices of the Inferior Court for Liberty County having failed to select fit and proper persons to serve upon said Jury, and furnish a list of such persons to the Clerk of this Court, and that the said Justices opened the Jury boxes of this Court and transposed, changed and altered the names in said boxes, not in the presence of the Judge and Clerk of this Court, and contrary to the Statute in such case made and provided.

2d. That the panel now put upon the prisoner, consists of but twenty-three of the original panel drawn, and is made up of talesmen summoned ; the thirty-nine Jurors of the original

Rafe (a slave) *vs.* The State.

panel in attendance not having been exhausted by challenge or otherwise.

3d. That the Jury now impanneled, is not the Jury drawn at the last term of this Court to try all criminal causes at the present term of this Court.

4th. That the Jury now impannelled, is chosen and select-ed contrary to the laws of the State of Georgia, regulating Jury trials at the time of the alleged commission of this of-fence.

5th. That the Jury now impanneled, has not been sum-moned and impanneled in the manner contemplated by the Constitution of the State of Georgia, declaring " that trial by Jury as heretofore used in this State, shall remain inviolate."

Which challenge to the array the Court over-ruled and re-fused to allow, and defendant excepted.

Upon this exception the Judge certified that the Justices of the Inferior Court, with the Sheriff and Clerk, on 1st Mon-day in June, 1854, from the Tax Receiver's books, selected the persons for Grand Jurors, and instead of sending them to the Superior Court, placed them immediately in the Jury boxes.

CHARLTON SANDIFORD, one of the Jurors, was sworn on the *voir dire*, and the Solicitor General proceeded to pro-pound the four questions prescribed in the ninth sec. of the Act of 1856, regulating the mode of impanneling Jurors in criminal cases, and declaring who are qualified and liable, &c.; to which questions Counsel for defendant objected; which objection being over-ruled, defendant excepted.

The Juror having qualified himself, the defendant demand-ed to have him put upon triors, which demand was refused by the Court, and prisoner excepted.

One of the Jurors upon being asked the first question up-on the *voir dire*, answered that he had formed and expressed an opinion as to the guilt or innocence of the accused, but that such opinion was not formed from having seen the crime committed or from having heard any part of the evidence de-livered under oath. The State then put the Juror upon the

prisoner, he having answered the other three questions. Prisoner objected, that he ⁀ as not an impartial Juror and incompetent; whereupon, the Court examined the Juror touching the strength and permanency of his opinion, and among other questions, inquired of him if he thought he could return a verdict in accordance with the evidence as it might be delivered from the stand; and upon his answering in the affirmative, and that his opinion was not fixed and positive, pronounced the Juror to be competent, and over-ruled the objection; to which defendant excepted.

JACOB THIESS, on the part of the State testified: that he is the Sheriff of Liberty County; did not arrest prisoner; he was arrested in Savannah. Witness brought prisoner from Savannah on the 7th August, 1855. Met on the other side of Mount Hope Swamp, Mr. Orr, Lee, Lane and others. Directly after leaving Savannah, interrogated prisoner. This was some four or five days after body was found, and after Coroner's inquest. Asked prisoner if he had killed his master; prisoner said he did not; that it was a white man and two negroes. Witness replied, Rafe, you were seen with your master, and your master has been found murdered. Witness also said that the people of Liberty believed that he did it. Witness told him if he did do it he had better acknowledge it, but if he did not do it not to acknowledge it; that if he lied, it would be adding sin to sin; that the people of Liberty were so satisfied he did it they would hang him any how. Witness also said in the beginning, Rafe, that won't do. Witness also told Rafe that there were witnesses here who would prove that he did it.

Commenced conversation about one mile from Savannah. Mr. Quarterman asked prisoner several questions. Witness then asked him what made him kill his master. Prisoner said the devil had got into him. Witness asked prisoner how he did it. Prisoner said his master allowed him to carry a stick, to carry carpet bag on his shoulder; that he was walking on the left side of his master. Witness asked how he struck his master. Prisoner said he held the stick in both

Rafe (a slave) *vs.* The State.

hands, and knocked him off the horse; that his master groan-ed, but said nothing. Witness asked him how his master's hand was cut. Prisoner said he jerked the knife out of his hand—could not explain how he jerked the knife out of his master's hand, and he being on the left side; prisoner said he struck his master on the neck. Witness asked the pris-oner if he would know the spot where his master was killed, when we got there. Witness did not know the spot himself. When we were near the spot we stopped—prisoner said a little further on ahead. That spot is in the County of Liberty and State of Georgia. Place was a little further on, as prisoner stated. Witness told prisoner he was bringing him to Hines-ville, to put him in jail; that they would meet his master on the road; that he was in his custody, and that no one should hurt him; told him this when he stated he should meet his master. · Prisoner seemed afraid. Didn't think it was before he confessed that he told him no one should trouble him; it was in the early part of the day. Said nothing to prisoner about the overseer, or that we were going to the overseer. Prisoner expressed some fears that he would be whipped—told prisoner no one dared to molest or trouble him while he was in custody of witness; may have been before or after confession, but think it was after. Witness had made up his mind before leaving home to get all he could out of prisoner as to facts. Witness believed at the time it would be illegal testimony, or would not have asked questions. Did not think it would be right to ask prisoner to confess and then come into Court and repeat it. Prisoner did not tell at the time who took his hand-cuffs off. Prisoner has confessed and de-nied several times since to me and others. Witness meant, when he said he would get the facts from prisoner, that he would question him. When witness put the questions, he was not under the impression that he was using threats or promises.

To the admission of which testimony Counsel for defendant objected, on the ground that the confessions of prisoner were induced by threats and promises, and were not free and vol-

untary, which objection was over-ruled, and Counsel for de-
fendant excepted.

On these exceptions error is assigned.

MILLER & WILSON, for plaintiff in error.

Sol. Gen. HARTRIDGE, for the State.

*By the Court.*—McDONALD, J. delivering the opinion.

After the issue had been formed between the State and
the prisoner on the bill of indictment, when a panel of forty-
eight Jurors were put upon him, he challenged the array on
the grounds above stated. It appears by the certificate of
the presiding Judge, that the Justices of the Inferior Court,
together with the Clerk and Sheriff, on the 1st Monday in
June, 1854, from the books of the Tax Receiver, selected
persons deemed *to* be fit and proper persons to serve as
Grand Jurors; that the lists containing the names were not
sent to the Superior Court, but that the names were separa-
ted and put into the Jury-box, as Grand Jurors; that the
names, not thus selected, were put into the box as Petit Ju-
rors, and that the names of the Jurors were not entered into
a book provided by the Clerk for that purpose, but that the
very names that were selected as Grand and Petit Jurors,
and which would have been put in the box by the Judge if
they had been sent to him, were put in it. All the persons
drawn as Petit Jurors at the preceding term of the Court,
were put upon the panel, with the exception only of those
who were not in attendance; and, in all, there were thirty-
eight—twenty-three of whom had been sworn on the panel at
the opening of the Court—and fifteen, being present, were
summoned as talesmen.

[1.] The Statutes for selecting Jurors, drawing and sum-
moning them, form no part of a system to procure an *impar-
tial* Jury to parties. They establish a mode of distributing
Jury duties among persons in the respective counties, subject

Rafe (a slave) *vs.* The State.

to that kind of service, and of setting apart those of supposed higher qualifications for the most important branch of that service ; they provide for rotation in Jury service ; they prescribe the qualifications of Jurors, and the time and manner of summoning them, and are directory to those whose duty it is to select, draw and summon persons for Jurors.

By this means the Court is supplied with Juries to aid in the administration of the laws ; every person subject to that kind of duty is called out, in turn, to perform it, and those called on have timely notice, so that they may arrange to perform a public duty at the least inconvenience to their private affairs.

At every Court of criminal jurisdiction, where the right of trial by Jury is allowed, there must be two Juries—a Grand Jury, whose duties are accusative, and who usually hear evidence to accuse only, and Petit Juries, who are to try the persons whom the Grand Jury accuse of crimes. The Statutes referred to secure the attendance of persons to make these Juries.

[2.] No person sworn on one of these Juries, can serve on the other ; that is, the members of the Grand Jury who accuse the defendant, cannot be of the Petit Jury to try him. But because a person belongs to the Grand Jury list of the county, he is not disqualified nor excused from serving on Juries to try offenders. If he has not been sworn on the Grand Jury *of the term* of the Court at which the trial takes place, he is a qualified Juror, provided, under the old law, he was qualified to vote at elections for members of the Legislature, and now, if he has the qualification required by the Statute of 1856 ; for all by-standers and others having the qualifications required by law to serve as Jurors, may be summoned as talesmen to make a full panel for the trial of offenders, without regard to the selection made from the Tax Receiver's book, under the Statute.

[3.] The 34th section of the 14th division of the Penal Code, has no reference whatever to the mode of selecting

Jurors, drawing and summoning them. It has reference to the act charged as an offence. The accused shall be tried! and punished according to the law as it stood when the offence was committed, although the law making it an offence may have been repealed. But independent of this, what has been said in reference to the other points, is decisive of this ground of objection.

[4.] The trial by Jury, as it was used in Georgia prior to the adoption of the Constitution of 1798, is not affected by the mode in which the Jury in this case was impanneled and summoned. The prisoner was tried by a Petit Jury ; he was accused by a Grand Jury ; he had the right of challenge and the privilege of proving by each Juror as he was put upon him, and other evidence, that he was incompetent as a Juror in his case, on any ground on which a Juror is challengeable. If the Jurors who tried him were not *"omni exceptione majores,"* he had a full opportunity of showing it before they were sworn. But what was the usage before the Constitution of 1798, in regard to the selecting, drawing and summoning Jurors ? It was, that it should be done agreeably to such regulations as the Legislature might prescribe. The Legislature had prescribed the mode in which it should be done; and the Legislature, at the first session after the adoption of the Constitution, did the same thing; and although the interpretation of the Constitution by the Legislature furnishes no *governing rule* for this Court, when its action so soon follows the Constitution, and when many of the delegates who framed the Constitution were probably in the Legislature, it is entitled to great consideration. The trial by Jury which had been used in this State prior to the Constitution of 1798, was a trial of every freeman charged with a crime by his peers ; that he was not to be tried upon the charge of an individual, but a Jury should accuse him before he should be called to answer ; to try an accusation thus made, he should have a Jury made of impartial persons; and in all cases he should enjoy the right of showing that the persons called to try him were not impartial. All these pri-

Rafe (a slave) *vs.* The State.

vileges the prisoner in this case had, and the Act of 1856 deprived him of none of them. That Act gave the prisoner, (indicted as he was for murder,) as a matter of right, a panel of forty-eight persons, from which a Jury for his trial might be selected. He had a right to demand it, and the Court had no power to refuse it.

The Act of 1856, secures to a party accused of an offence against the laws, an impartial Jury, made of persons of sound mind, sober, free from favor arising from kindred to either party, or to the deceased, (in trials for murder,) who have not formed *or* expressed an opinion as to the guilt or innocence of the accused, from either having seen the crime committed, or from having heard any part of the evidence delivered on oath; who have no prejudice or bias resting on their minds for or against the accused, and whose minds are perfectly impartial between the State and the accused. But it is objected, that if a person has formed and expressed an opinion as to the guilt or innocence of the accused, from rumor only, he ought not to try the cause; and that such person was held to be incompetent before the Constitution of 1798. As has already been said in respect to other grounds, it is sufficient to say, that before that time, such matters had been the subjects of legislative regulation, and such legislative regulations had never been considered as infractions of the great privilege of trial by Jury. The terms found in the Constitution, " *as heretofore used in this State,*" do not restrict the legislative power over the subjects embraced in the Act of 1856. But it is by no means certain that an expression of opinion, whether upon a knowledge of facts or upon rumor, if there were with it no mixture of partiality, or of ill will, or bias, or prejudice against the accused, rendered a person an incompetent Juror under the law as it existed and was practised at that time. Men of the soundest heads and purest hearts, and without the slightest prejudice against the perpetrator of a crime, might pass an hypothetical opinion in his case, predicated on rumor, and still be competent to do ample justice upon hearing testimony falsifying the rumor.

Rafe (a slave) *vs.* The State.

Indeed, if the rumor had been adverse to the innocence of the accused, condemnatory of him altogether, slight circumstances of palliation would have a more powerful influence in favor of the accused than if the Juror had heard no rumor.

In the case of *Robinson vs. The State of Georgia,* this Court held, that the Act of 1843 did not take away the right to challenge a Juror "*propter affectum,*" but only prescribed the manner in which that right should be exercised. (1 *Kelly,* 571.) So it is with the Act of 1856. The prisoner has all his rights; but the manner in which they are to be exercised, is changed.

But has the right of a slave to a trial by Jury, as it existed before the Constitution of 1798, been violated in this case or by the Act of 1856?

The evidence in this case shows that the confessions objected to were not elicited by promises or threats; and although they may have been induced by the remarks and interrogation of the Sheriff, the record shows that they were voluntarily made, and are admissible, though, as was said in *Wilde's case,* I much disapprove of the manner in which they were obtained—spiritual exhortations had better be left to the clergy.

Judgment affirmed.