## RAWLINGS *v.* THE STATE.

1. Under the provisions of section 875 of the Penal Code of 1910, whenever the judge anticipates that the session of any court of record is about to be so prolonged beyond the period for which juries were drawn at the close of the preceding term, or from any other cause the court is about to convene and there have been no juries drawn for the same, the judge may draw such juries as may be necessary. Under the provisions of section 796, judges of the superior courts may, in their discretion, hold adjourned terms in any county in their circuits whenever the business requires it, and in the exercise of a sound discretion may cause new juries to be drawn for the same. In view of the foregoing provisions the trial judge did not err in overruling a challenge to the array, based upon the ground that the 48 jurors placed upon the panel was taken altogether from a list of 100 jurors drawn especially for the trial of the accused, although the list did not include any of the regular panel of jurors empaneled and sworn at the preceding

---

Courts, 15 C. J. p. 887, n. 6.

Criminal Law, 16 C. J. p. 141, n. 19, 23, 26; p. 644, n. 77; p. 647, n. 92; p. 656, n. 5; p. 657, n. 12; p. 662, n. 62, 65; p. 663, n. 76, 77.

Homicide, 30 C. J. p. 303, n. 24 New.

Juries, 35 C. J. p. 281, n. 31; p. 282, n. 34, 35; p. 283, n. 60.

regular term of the superior court (and who had been discharged by the judge), nor any of the 57 tales jurors who had been drawn and summoned to serve upon a previous occasion when the court had taken a recess until Monday of the succeeding week. This is true without regard to the fact that the length of the terms of Johnson superior court are not fixed by law.

2. The acts and sayings of one of two codefendants, to which objection was made in the fourth, fifth, sixth, seventh, and eighth grounds of the motion for a new trial, were admissible in this case for either or both of two reasons. The evidence complained of was admissible as against the accused, first, because there was testimony tending to show that the design or conspiracy included concealment of the mode or manner in which the decedent was killed, with the purpose of creating the belief that this death was due to accidental causes. The testimony was also admissible in the trial of the accused, because the State had the right to ask that the defendant be convicted if the evidence showed his guilt as principal in the second degree, and in that event it was essential for the State to prove the guilt of the principal in the first degree. So for the latter reason it was competent to introduce the acts and sayings of the codefendant of the accused as principal in the first degree. "The conviction of one whom the State contends to be a principal in the second degree can not be sustained against the objection that the finding is contrary to law, unless the guilt of the principal in the first degree is made to appear."

3. For the same reasons as stated in the foregoing headnote the court did not err in admitting the testimony of which complaint is made in the ninth and tenth grounds of the motion for a new trial.

4. The objection to the testimony of which complaint is made in the eleventh ground, based upon the ground of irrelevancy, should have been sustained. However, since it is not made to appear in the assignment of error, nor does a careful consideration of the record disclose, how the admission of this irrelevant testimony could have harmed the defendant, the trial judge did not err in refusing a new trial in the absence of other errors. Injury must concur with error, to require the grant of a new trial.

5. The introduction of documentary evidence obtained from a receiver of the property and assets of one accused of crime by the process of subpœna duces tecum, although such evidence may be incriminatory in its nature and tend to convict the accused of crime, is not violative of the constitutional provision which forbids that such person be compelled to give testimony tending to incriminate himself.

6. The court did not err in admitting the testimony which was introduced over the objection stated in ground thirteen of the motion, for the reasons set forth in the second division of this opinion.

7. The question raised in the fourteenth ground of the motion for a new trial is whether it was error for the judge to charge the jury upon the subject of confessions. It is insisted by the plaintiff in error that neither the evidence nor the statement of the accused authorized instructions upon the subject of confessions. This question being for decision by six Justices, who are equally divided in opinion, Russell, C. J., Beck, P. J., and Atkinson, J., being of the opinion that it was

error to give the instruction of which complaint is made, and Hill, Gilbert, and Hines, JJ., being of the opinion that the instruction of which complaint is made is not such as to require the grant of a new trial, the judgment of the lower court in overruling the motion for a new trial upon this ground thereof stands affirmed by operation of law.

No. 5232. NOVEMBER 25, 1926. REHEARING DENIED JANUARY 15, 1927.

Murder. Before Judge Camp. Johnson superior court. November 24, 1925.

J. J. Tanner and C. G. Rawlings were jointly indicted as principals for the murder of G. A. Tarbutton, whom it was alleged they "of their malice aforethought did kill and murder by shooting the said G. A. Tarbutton with a certain gun which the said J. J. Tanner and C. G. Rawlings then and there held." The defendants elected to sever; and Tanner having been previously tried, C. G. Rawlings was formally arraigned on August 17, 1925, and pleaded not guilty. Upon the panel of jurors being furnished by the clerk to counsel for the defense, Rawlings in writing challenged the array as the same will hereafter be summarized. In connection with the grounds set forth in the challenge it was admitted by counsel that on Monday, March 30, when the court reconvened after the trial of Tanner, the case of Rawlings was called, and the defendant presented a motion to change the venue, and, after the same was overruled, presented a bill of exceptions which had the effect of a supersedeas until the appeal could be heard first by the Court of Appeals and afterwards by the Supreme Court of Georgia; and upon such supersedeas being filed in Johnson superior court, the judge thereupon discharged the jury. Also that "the court recessed on March 30, 1925, after the bill of exceptions referred to in the preceding paragraph was filed, until the third Monday in June, 1925, and then recessed until the third Monday in August, 1925." After a hearing the challenge to the array was overruled, and exceptions pendente lite were filed. In the bill of exceptions error is properly assigned upon the exceptions pendente lite. The trial of the defendant resulted in a verdict of guilty, with a recommendation to life imprisonment. A motion for a new trial was overruled, and exception is taken to that judgment. Besides the general grounds the defendant's motion is predicated upon several special grounds.

The fourth, fifth, sixth, seventh, eighth, ninth, and tenth grounds of the motion assign error upon the admission by the court of certain alleged illegal evidence. The fourth ground complains that

Dr. H. B. Bray, a witness for the State, was permitted to testify as follows: "I was present at the time they held the inquest over Mr. Tarbutton's body. The inquest was held the next day after the homicide. On that occasion Mr. Tanner showed us where he was standing, and where Mr. Tarbutton was standing at the time of the homicide. Some stobs were put on those particular spots. Mr. Rawlings was not there when Mr. Tanner made those statements, and they were not made in Mr. Rawlings' presence or hearing. I think my brother Charlie, W. S. Williams, and M. R. Bradley put those marks there. My brother drove down the stob where Tanner said Mr. Tarbutton was lying. It was fifteen feet and one inch from the stob where Mr. Tanner claimed to have been standing to where Mr. Tarbutton's feet were." In the fifth ground complaint is made of the admission of testimony by the same witness, "to the effect that it was seven feet in distance from where Tanner said at the inquest he was standing to where Tanner said Tarbutton was standing, and that there was sixteen inches fall downwards in the land from where Tanner said he was standing to where Tanner said Tarbutton was standing." The sixth ground assigns error on the admission of testimony from the same witness, "to the effect that on the morning after the homicide he witnessed an experiment in which a man was placed at the position where Tanner had said he was standing at the time of the homicide, and another one was placed at the position where Tanner had said Tarbutton was standing, these two men being approximately at the same height as Tanner and Tarbutton respectively, and the man standing where Tanner said he was standing brought a gun to a level with his shoulder, and then a spirit level was put on the gun and it showed that the shot would have gone straight through Mr. Tarbutton's head and about four inches from the top of his head, and that the range of the gun was practically on a level; that the above statements of Tanner were made at the inquest over Tarbutton's body the day after the homicide, and said statements were not made in the presence or hearing of the defendant Rawlings."

In the seventh ground complaint is made of the admission of testimony by a witness for the State, Dr. S. M. Johnson, "to the effect that if a man of Tarbutton's height was standing where Tanner had said at the inquest, the day after the homicide, that

Tarbutton was standing, and another man five feet and nine inches tall was standing at the place where Tanner had said at the inquest that he, Tanner, was standing, and they were seven feet apart on land that had a fall of two inches to the foot, and if the man who was standing where Tanner had pointed out that Tarbutton was standing was shot through the back of the head by a man standing where Tanner had said at the inquest that he, Tanner, was standing, like Mr. Tarbutton was shot, the shot could not have been made except from the shoulder." In the eighth ground complaint is made that the court admitted testimony by M. E. Crowe, a witness for the State, as follows: "I was a member of the coroner's jury that held an inquest over the body of G. A. Tarbutton. Mr. Tanner pointed out the spot to me that represented the place where he was standing. He also pointed out the spot where Mr. Tarbutton was standing when he was shot. It was something like seven or eight feet between the spot where Mr. Tanner said he was standing and the spot where he said Mr. Tarbutton was standing. It was seven feet and an inch or two. The course of the shot could not have been traced from where Mr. Tanner said he was standing, because he said he was to the right of where Mr. Tarbutton was standing, three and a half feet from where this stob was driven up in the path, three and one half feet from the path. The path commenced to crook just below the stob where Tanner said they were standing, just below where Tanner said Tarbutton's head was, and then came back and went to where we found the last brains. That was fourteen feet. Just before it got to where Tanner said he was, it crooked to the left, about eighteen inches crook. The brains were found on a direct line with the stob where Mr. Tanner said he was standing. Mr. Tanner said he was standing about three and one half feet from that path. I asked him if he meant to tell us that he stumbled over the bush out there three and a half feet from the path. He said, 'Well, gentlemen, I don't know where I was standing. I don't know how it happened.' He said he was carrying the gun, holding it down by his right side, and that when he fell he throwed it out to the right, this way [indicating] and fell this way [indicating]. He fell forward. The above statements of Mr. Tanner were made at the inquest the day after the homicide and in the absence of Rawlings."

In the ninth ground complaint is made that the court admitted

in evidence the testimony of Mell Brantley, "that a certain photograph, which witness exhibited to the court and jury, had been made in his presence, that said photograph represented a man of the same height as Tarbutton standing in the position where Tanner had pointed out at the inquest that Tarbutton was standing, and that said photograph also represented a man of the same height as that of Tanner standing at the position where Tanner was said to have stood and at the point indicated by Tanner in his statement at the inquest as the point where he, Tanner, had stood at the time of the homicide, and in the hands of the man standing in the Tanner position was shown a shotgun brought to the level of the shoulder on a direct level range with the back of Tarbutton's head; all according to said positions pointed out by said Tanner in his statements at the inquest, the day after the homicide." The tenth ground of the motion assigns error on the admission in evidence by the court of the photograph described in the preceding ground. The objections offered to the admission in evidence of the excerpts from the evidence were in each case substantially the same: that the testimony, experiment, and photographs were hearsay evidence, based upon hearsay evidence, being based upon statements made by Tanner at the inquest the day after the homicide and not in the presence of the defendant Rawlings, and such statements by Tanner being made after the alleged enterprise had ended.

The eleventh ground of the motion contains the complaint that the court erred in admitting in evidence the testimony of Hyman Joiner, "to the effect that over thirty years before the trial of the defendant Rawlings, he had stated to the witness that years before that, he, Rawlings, had swapped places or plantations down in Johnson County with the Tarbutton boys, and that the Tarbutton boys gave him ten thousand dollars and paid him every dollar of it in two years." This testimony was objected to on the ground that it was irrelevant to the real issue in the case, and tended to mislead and confuse the jury and to injure and damage the defendant before the jury by injecting into the trial a false and spurious issue in the case, to wit, the merits of a land trade between Rawlings and Tarbutton more than thirty years before the trial.

In the twelfth ground error is assigned upon the admission in

evidence of six described insurance policies which had been issued or assigned to C. G. Rawlings or the firm of Tarbutton and Rawlings, which were originally in the possession of C. G. Rawlings, and which had been turned over and delivered by him some months before the trial to L. B. Holt, of Sandersville, as receiver appointed by the judge of the superior court of Washington County, in which the defendant resided then and still resides, to take charge of all the money, effects, and papers of said Rawlings in a certain case pending in Washington superior court between certain creditors and said Rawlings. It is alleged "that the said Rawlings was required and forced, on the 18th day of April, 1925, to which proceedings said C. G. Rawlings consented, to deliver all of his said property, money, and effects to the said . . receiver in conformity with said order," and that included among his papers were the described insurance policies which were surrendered to the receiver in obedience to the order of the court, which he was forced to obey, and that a few days prior to the trial the receiver was required by the process of subpœna duces tecum to bring the policies into court to be used against the defendant. The following objection was made to the admission of the policies: "that by the process above described the defendant Rawlings has been forced and compelled by legal process to give testimony tending to incriminate himself," in violation of the constitution and laws of the United States and the constitution and laws of the State of Georgia, and particularly in violation of art. 1, sec. 1, par. 6, of the constitution of Georgia and the fifth amendment to the constitution of the United States.

In the thirteenth ground it is alleged that the court erred in refusing to exclude the testimony of the witness Ray Huie, that "While in Johnson County jail a few weeks ago, I heard Tanner tell Rawlings that he was not doing what he promised to do. I heard Tanner tell Rawlings that Noah Covington must have been where he said he was, or he could not have told so straight a tale. I heard Tanner say that he wished he had not had anything to do with it; but before I heard Tanner say he wished he had not had anything to do with it, I heard someone sniff, and when I came out of my cell there was tears in Tanner's face." The objection offered in support of the motion to exclude this testimony was "that Tanner was not on trial, and no statement made by Tanner

was admissible against the defendant Rawlings, in which Rawlings did not consent and concur; and because the declaration of the alleged coconspirator Tanner, made after the conclusion of the enterprise, was admissible only as against himself, and not against the defendant Rawlings; and because the defendant Rawlings did not concur in or assent to the statement of said Tanner, but on the contrary expressly denied same."

In the fourteenth ground it is assigned as error that the court charged the jury as follows: "The court leaves it to you all to determine whether or not there was any confession made in this case; and if a confession was made, was that confession freely and voluntarily made without being induced by another by the slightest hope of benefit or remotest fear of injury. If there was no confession made, or if a confession was made, but it was not freely and voluntarily made, or if it was induced by another by the slightest hope of benefit or remotest fear of injury, you must exclude it entirely from your consideration in determining your verdict. If there was a confession made freely and voluntarily without being induced by another, as I have already given you in charge, you may consider such confession in determining your verdict. If you find there was a properly made confession, such confession should be received with great caution; and a confession alone, uncorroborated by other evidence, will not justify a conviction." It is alleged that the charge as just set forth was based exclusively upon the testimony of Ray Huie, a witness for the State, as follows: "I heard Tanner tell Rawlings that he was not doing what he promised to do, and Rawlings told Tanner that the insurance money was tied up in court, but as quick as it was got out of court he would do what he promised to do. I heard Tanner tell Rawlings that Noah Covington must have been where he said he was, or he could not have told as straight a tale as he told, and Rawlings said that was bought evidence, and then Tanner said, 'I wish I hadn't had anything to do with it;' but before I heard Tanner say he wished he hadn't had anything to do with it, I heard some one sniff, and when I came out of my cell there was tears in Tanner's face." The instruction is assigned as error upon the ground that the law of confessions was not involved in this case, and there was no testimony that the defendant Rawlings had ever made a confession to any one upon which to predicate

such charge; that the above testimony did not amount to a confession on the part of Rawlings; and that for the court to charge the law of confessions prejudiced the case of movant before the jury, authorizing them, if they believed the testimony of Huie, to find that Rawlings had confessed his guilt of the crime, which was error for the reason that the quoted testimony, which is the only evidence in the case that even touched upon the subject of confessions or admissions, did not amount to a confession in law, and was not sufficient in law to authorize or justify a charge to the jury upon the law of confessions.

From the evidence in the case it appeared that Tarbutton was carried, on the afternoon of the homicide, by Rawlings in his automobile to a rough bluff on the Oconee river on one of Rawlings' plantations known as Ring Jaw Bluff, where they met Tanner, who accompanied them with a double-barrel shotgun. An eye-witness swore that from a nearby point near a spring he saw Tarbutton and Tanner and Rawlings in the order named going down a path on the wooded hill or bluff. Almost immediately after he saw the party he observed Tanner look around behind him towards Rawlings, and then take deliberate aim and shoot Tarbutton through the back of the head. According to this witness, all of the party were standing upright as they walked, and neither Rawlings nor Tanner stumbled or fell. The only person who fell was Tarbutton, who, according to this witness, fell immediately upon the firing of the gun. A negro who was walking nearby, and who was sent for after Tarbutton was shot, was told by Rawlings as well as Tanner that the death of Tarbutton was due entirely to accident; that Tarbutton was going down the hill just ahead of Tanner, who was carrying his shotgun, when Tanner stumbled and fell, and that in falling the gun was accidentally discharged, whereby the load of shot was caused to enter the back of Tarbutton's head. Rawlings said that the first thing he saw was that Tarbutton was falling to the ground, and that Tanner had fallen to his knees. The body of the deceased was carried to his home by Rawlings, who was a relative, and there the accused again explained to members of the family, and numerous others who came, how the death of Tarbutton was caused by the falling of Tanner and the accidental discharge of the gun due to Tanner falling. According to the statements of the defendants there was

no eye-witness to the shot, other than Tarbutton and themselves; but the jury had before it the testimony of Noah Covington, who testified to a deliberate killing committed by Tanner in the presence of Rawlings, which the latter upon every occasion declared was due only to the fact that the gun was accidentally discharged while Tanner was falling to the ground, instead of being deliberately aimed and discharged, as related by the witness Covington. Among others, the following circumstances are in evidence: At the time of the homicide Tarbutton's life was insured for more than $200,-000. This insurance, with the exception of $50,000 which was payable to a bank of which Rawlings was principal stockholder, and a smaller policy which was payable to Rawlings and Tarbutton, was all payable to the defendant, C. G. Rawlings. Much of the insurance provided that the amount stipulated in the policy to be paid upon the death of Tarbutton would be doubled if the death was caused by accident. There was evidence that Rawlings had for some time been endeavoring to convince Tarbutton that the tract of land on which the homicide occurred contained valuable deposits of bauxite, and had offered to share with him profits derived from mining the bauxite; and the ostensible purpose of Tarbutton's visit the afternoon he met his death was to examine certain excavations made upon the land by hands employed by Tanner. As a circumstance showing the falsity of Rawlings' account of the manner in which Tarbutton was killed, the prosecution introduced evidence tending to show, from the nature and direction of the wound in Tarbutton's head, that it would have been impossible for the shot to have ranged as they did if the gun had been fired while Tanner was falling, as stated by both Tanner and Rawlings. It was shown that the grade of the path on which the killing occurred did not exceed two inches to the foot, that according to the statements of both of the defendants Tanner was not more than seven feet behind Tarbutton, and that consequently the wound as it actually appeared could have been made by a shot directly aimed as testified by Covington, but could not have been produced as it was had the gun been discharged while Tanner was falling. There was evidence from other witnesses, showing a discrepancy in the statements of the defendants as to the location of certain vines and bushes near the scene of the shooting; and the testimony of these witnesses as to the location of these objects tended to

contradict the defendants' statements of the manner in which the death of Tarbutton was caused. A witness who was in jail at the time when Rawlings and Tanner were in jail together testified to the conversation as above set forth in the fourteenth ground of the motion for a new trial. According to this witness, Rawlings did not protest that Covington's testimony was untrue, but said it was bought evidence.

*Hardwick & Adams, Hightower & New, Evans & Evans, Wright & McMillan,* and *C. S. Claxton,* for plaintiff in error.

*George M. Napier, attorney-general, Fred Kea, solicitor-general, T. R. Gress, assistant attorney-general, J. L. Kent, W. C. Brinson, J. J. Harris,* and *E. L. Stephens,* contra.

RUSSELL, C. J. (After stating the foregoing facts.)

1. Upon being furnished with a list of the panel of jurors as provided by section 997 of the Penal Code of 1910, C. G. Rawlings challenged the array. The trial judge overruled the challenge, and exception is taken to this judgment. Summarizing the facts upon which the challenge was based, it appears that a jury was regularly drawn at the preceding September term, for the March term, 1925, of Johnson superior court and at the latter term was regularly empaneled in accordance with the provisions of section 857 of the Penal Code. The traverse jurors were discharged on Saturday, March 28, 1925, and the trial judge drew 57 jurors to appear and serve on March 30, 1925, to which date the court took a recess. The defendant's case was assigned for trial on March 30, 1925. When the court reconvened in accordance with the order taking the recess, and upon the filing of a bill of exceptions to the judgment overruling a motion made by the defendant for a change of venue, the court discharged the 57 tales jurors who had been drawn for the purpose of being used in the trial of the defendant, and took a recess until the third Monday in June, and then recessed until the third Monday in August, 1925. The court not having finally adjourned, on Thursday, August 14, 1925, the judge drew a new panel of 100 "traverse tales jurors," whom he ordered to be summoned to attend court on Monday, August 17, 1925, and from this 100 jurors the panel put upon the defendant was taken, to the exclusion of all the jurors regularly drawn for the term and all the tales jurors drawn on March 28, 1925. The complaint of the plaintiff in error is that the presiding judge had no right in

law to arbitrarily exclude the regularly drawn traverse jurors, and arbitrarily excuse the first panel of tales jurors drawn by him on March 28, 1925, and arbitrarily substitute the tales jurors drawn by him on August 14, 1925. Johnson superior court convenes twice a year, on the third Mondays in March and September. The length of the term is not fixed by law. Acts 1911, p. 61; Acts 1913, p. 65. It is admitted in the brief and argument that the whole of the second week of the March term, 1925, of Johnson superior court, ending on Saturday, March 28, was consumed in the trial of another case. From the acts fixing the terms of Johnson superior court above referred to, it must be presumed that the regular panel of jurors for that term had already served two full weeks. So we can not say that the discharge for the term of all of the jurors regularly drawn for service at that term was arbitrary, as insisted by the plaintiff in error.

However, regardless of this, when the court reassembled after a temporary recess, and before the qualification of the jury became important or was in order, the defendant moved a change of venue, and upon the overruling of his motion filed a bill of exceptions, which operated to continue the defendant's trial until an adjudication upon the bill of exceptions. As the court could not foresee the exact length of time which would elapse before a determination of the issue raised in the bill of exceptions, it was entirely proper for the court to discharge the 57 talesmen who had been summoned in anticipation of a trial on March 30, which was indefinitely postponed. The court then ordered an adjournment until June, and then, doubtless because the trial upon review had not been completed, again adjourned until August 17, 1925, and thus was constituted an adjourned term of the court to begin on August 17, 1925, in which the presence of jurors might be necessary; and accordingly, on August 14, the judge drew a jury of 100 who were summoned to appear for duty at this adjourned term of court set for August 17, 1925. Did the court have the power to thus constitute a jury for the trial of the defendant? We think that the ruling of this court in *Woolfolk* v. *State,* 85 *Ga.* 69 (11 S. E. 814), conclusively answers this question, and is controlling. In that case this court construed section 3942 of the Code of 1882, and applied it to a state of facts identical with those presented by the challenge to the array in this case in respect to the fact that the

27

court which was about to try one accused of crime found itself without a jury with which to proceed in the trial. Section 3942 still is of full force, it being section 875 of the Penal Code of 1910. In *Woolfolk's* case the situation was brought about by the court's discharge of the regular panel of jurors after a mistrial. In the present case it was brought about by the fact that the court was obliged to suspend or adjourn, because of the filing of the bill of exceptions to the judgment overruling the motion to change the venue. But in *Woolfolk's* case, as in the case at bar, none of the original panel of regular traverse jurors were embraced in the jury put upon the defendant and to which the defendant objected by challenging the array. So it will be readily seen that the precise question now before us was adjudicated in *Woolfolk's* case.

In passing upon this question this court said: "The power of the judge, under the circumstances above stated, to draw a jury and have the jurors summoned and put upon the defendant, is the only question made by the defendant upon this branch of the case. If the judge had the power to draw this jury, he was right in overruling the challenges; if he did not have the power, he should have sustained them. The several sections of the code which regulate the drawing of juries provide for the drawing of a jury in almost every conceivable case where one is needed; and the general tenor of the code is to give power and authority to the judge of the superior court to draw and summon juries whenever the business of the court requires it. We think that, under section 3942 of the code, the trial judge, under the peculiar facts of this case, had power and authority to draw the jury as he did. That section is as follows: 'Whenever the session of any court of record in this State shall be prolonged beyond the week or period for which juries were drawn at the close of the preceding term, as by law provided, or the judge anticipates that the same is about to be so prolonged, or from any other cause such court has convened or is about to convene, and there have been no juries drawn for the same, it shall and may be lawful for such judge to draw juries, so many as may be necessary for such court, and cause them to be summoned accordingly, in the manner prescribed for drawing juries at the close of the regular terms of such courts respectively.' Here was a court which had met for the express purpose of trying the defendant. The juries were properly organized at the commencement

of the court. For some reason, which the judge doubtless deemed sufficient, these jurors had been discharged and a mistrial had been declared. The above section provides that if the session of the court shall be prolonged beyond the week '*or period for which juries were drawn, or the judge anticipates that the same is about to be so prolonged*,' it shall be lawful for him to draw juries and cause them to be summoned. . . After the mistrial, a new period for the sitting of the court was entered upon, to wit, the period of a second trial, which was not anticipated when the court convened. To have such second trial at that same term, it was necessary to prolong the court beyond the period for which the discharged jurors had been drawn, that period having terminated when the first trial resulted in a mistrial. It is not doubted or disputed that if the judge had adjourned his court for a month or a week the day this mistrial was declared, he would have had the power and authority to draw a jury for the adjourned term thereof; if he had adjourned until the following Monday, no one would doubt that he had the authority, under this section, to draw a jury to meet him on that day. If he has the power and authority to open the box and draw a jury under such circumstances, would the giving of his order to the sheriff to summon them for the next morning make the jury illegal? It will be observed that this section of the code does not prescribe for what particular day, or how long in advance, the jury shall be summoned; and it does not appear that any objection was raised to the fact that the jury were summoned for the next day; the objection was that the judge had no power to draw the jury when he did. As the only objection made was want of power to draw the jury, we think there was no error in overruling the defendant's challenge to the array. . .

"It may not be quite obvious that the drawing of this jury falls within the exact letter of the statute, but that the spirit and meaning of the statute extend to it is manifest. Most courts would still hold that even if it was error for the judge to draw and summon the jury as he did, it was not such an error as would work a reversal of the case. In *Rafe* v. *State*, 20 *Ga.* 60, it was held by this court that 'the statutes regulating the selection, drawing and summoning of jurors are intended to distribute the jury duties among citizens of the county, provide for rotation in jury

service, and to insure at each court the attendance of persons to serve on juries, and are no part of a regulation to secure to parties *impartial* juries.' This decision has been approved and followed by many courts and text-writers. In 1 Thompson on Trials, § 34, p. 32, it is said: 'Statutory provisions respecting the drawing of the panel are generally regarded as directory merely, so that irregularities therein, unless plainly operating to the prejudice of the challenging party, form no ground for challenging the array.' See also authorities there cited. The same principle is announced in Thompson and Merriam on Juries, § 143. See also Colt *v.* Evans, 12 Conn. 242; Burlingame *v.* Burlingame, 18 Wisc. 299; State *v.* Knight, 61 Mo. 373; State *v.* Pitts, 58 Mo. 556; State *v.* Massey, 2 Hill (S. C.), 379. And see Friery *v.* People, 54 Barb. (N. Y.) 319, 336, where the reasoning in *Rafe's* case, supra, is quoted and approved. It is not claimed that the defendant was injured or prejudiced in any way by putting this jury upon him. There is no complaint that the jury which tried him was not as fair and impartial as any jury which could have been obtained in the county. . . Why should this long, laborious and expensive trial be gone over again because the original panel sworn at the beginning of the week was not put upon the prisoner? . . With courts generally, as we gather from the authorities, the great and controlling question is, did the accused have a fair trial by an impartial jury? If so, the law has been complied with, and he has no right to complain that his challenges were not sustained." We are aware that there are some decisions of this court which indicate that challenges to the array should be sustained upon purely technical grounds, upon the theory that one charged with crime should have accorded to him every right provided by law in the strictest conformity with every regulation affecting form as well as substance; and the writer is in accord with this view as so eloquently expressed by Mr. Chief Justice Bleckley, notably in the case of *Cochran* v. *State,* 62 *Ga.* 731, 732. However, in the present instance, since this court, in *Woolfolk's* case, applied the provisions of the Penal Code to a condition practically identical to the one before us, there can be neither difficulty nor doubt in holding that the trial judge did not err in overruling the challenge to the array.

2.   As will be seen from the statement of facts, the fourth, fifth,

sixth, seventh, and eighth grounds of the motion for new trial may properly be considered together. In essence, all of these assignments of error raise the question as to how far certain sayings or acts of the codefendant Tanner bind the plaintiff in error, so as to render statements of Tanner admissible as against the accused. We think the trial judge correctly admitted the evidence of which complaint is thus made. It is well settled, of course, that the sayings of a conspirator *after* the criminal enterprise has ended are inadmissible as against any of the conspirators other than he who made the statement or admission. Penal Code, § 1035. The extent, however, within which such admissions are competent is largely controlled by the nature of the enterprise which is the object of the conspiracy, and what was the ultimate purpose of the conspiracy. The language of the code (§ 1035), "after the enterprise is ended," necessarily makes admissible any statements made by any of the conspirators until the ultimate purpose of the conspiracy has been accomplished. Hence as a general rule it has been held that statements of one conspirator, subsequently to the actual homicide, are inadmissible against another conspirator absent at the time of the inculpatory statement. This holding was because the conspiracy included nothing more than the killing and the enterprise had ended. In any case, however, where a killing is only an incident in carrying out a purpose to accomplish some further object, it would seem to follow from the very wording of the code section that where the enterprise had not ended, because the real purpose of the conspiracy has not been achieved prior to the completion of the enterprise, statements made even after such a killing and until the purpose of the conspiracy has been fully accomplished would be admissible on the trial of any of those engaged in the conspiracy. In the present case the evidence for the State tended to show that the ultimate purpose of the conspiracy, if one existed, was to collect for the benefit of Rawlings the proceeds of certain insurance policies whose value would be greatly increased in case the death of Tarbutton, the insured, was caused by accident. If, as indicated by the evidence for the State in this case, the motive for the killing was the collection of the large sum of money embraced within the policy doubled by the belief that death was caused by accident, and for that reason the homicide was only an incident necessary to effect the success of the purpose for

which the conspiracy was formed, any declarations made by any conspirator would be admissible against any of the conspirators until the collection of the insurance was accomplished; for this was the paramount purpose of the conspiracy itself. Viewed in this light, we think that the evidence now under consideration was admissible under the general rule, because the enterprise did not end with the homicide. Even if the trial judge was not authorized by the evidence to find that the homicide was a mere incident in a conspiracy, the real purpose of which was to establish the fact that Tarbutton's death was due to accident, for the purpose of collecting double insurance, by reason of which it was essential to prove that his death was accidental, the evidence now under consideration was admissible for the reason that there was evidence which would have authorized the jury to find that Tanner was a principal in the first degree, and that Rawlings, though also charged as a principal in the first degree, was only guilty as a principal in the second degree.

This court has several times held that where several defendants are all charged as principals in the first degree, one or more of them may nevertheless be convicted even though the evidence only authorized a conviction of the accused as principal in the second degree; and has further held that the guilt of the principal in the first degree must be shown, in order to authorize the conviction of one accused of murder as principal in the second degree. Under the latter rulings, inasmuch as the evidence showed that Rawlings made no assault whatever and had no gun, it devolved upon the State in the present case to establish the fact that Tanner as a principal in the first degree was guilty of the murder alleged. So that the evidence to the admission of which exception is taken was admissible in this case to prove the guilt of Tanner as an essential prerequisite to the conviction of Rawlings for his participation in the alleged murder, in that (although he did no act directly contributing to the death of Tarbutton) he was still present aiding and abetting in the commission of the homicide. It has always been held by this court that upon the trial of an accessory before the fact the guilt of the actual perpetrator of the alleged crime must be shown. The guilt of the principal in the first degree in such cases may be established by the record of the trial and conviction or plea of guilty of this principal in the first degree, or it

may be established by testimony introduced for the purpose of showing the guilt of the principal in the first degree either by direct or circumstantial evidence. However, since a verdict find-ing the principal in the first degree guilty would only be con-clusive upon the named defendant himself and would not be con-clusive upon an accessory before the fact, or principal in the sec-ond degree, it would devolve upon the State to satisfy the jury beyond a reasonable doubt that the actor, the real perpetrator of the crime, was really a principal in the first degree, before it could be shown that the accused then on trial could be a principal in the second degree. In the case at bar, as only two persons were in-dicted, the State could not establish the guilt of Rawlings as a principal in the second degree unless it satisfactorily appeared that there was a principal in the first degree, and that the principal in the first degree was Tanner, the person jointly indicted.

As to the admissibility of the evidence for the reason first stated, this court ruled, in *Byrd* v. *State,* 68 *Ga.* 661: "The acts and conduct of one accomplice during the pendency of the wrongful act, not only in its perpetration, but also in its subsequent conceal-ment, are admissible against the other. So also are his sayings pending the common criminal enterprise." In that case Byrd and Betts were charged with larceny from the house. The evidence in the record showed that Byrd and Betts were together at the place and time when the larceny was alleged to have been committed; that they were in the store and near the place where the meat alleged to have been stolen was located; that Betts was seen to leave the store with a sack and something in it, and place it in a wagon in which both he and the accused returned home after night; that this occurred on Saturday evening, and on Monday morning, when officers with a search warrant were approaching the house of the defendants, Betts was seen to leave and go around his house with something under his arm wrapped in a cloth. As to this, Mr. Justice Speer said: "Prima facie under this proof, and during the pendency of the wrongful act, not only in the perpetration but in the effort at concealment, the act and con-duct of one accomplice is admissible against the other, as are also his sayings pending the common criminal enterprise. They go to establish his guilt; and if the other is shown to have aided and abetted the offence, they are evidence of his guilt, for the act of

one is the act of both when the common criminal intent is established." In *Carter* v. *State,* 106 *Ga.* 372 (32 S. E. 345, 71 Am. St. R. 262), where several defendants were jointly indicted as principals for the offense of arson, the court, over the objection of the accused, admitted evidence of certain acts on the part of D. H. Moody (a codefendant of Carter) and declarations accompanying the same. These acts were done and these declarations were made some time after the arson had been committed. A letter written by Moody to one Herrington, written at a still later period, was also admitted. However, inasmuch as there was evidence tending to show that there was a conspiracy to steal goods from the warehouse and burn the building, and also evidence tending to establish the contention of the State that Carter was concerned not only in the theft and arson, but also in a common intent to effectuate a concealment of these crimes, this court, following the ruling in the *Byrd* case, supra, held the evidence objected to to be admissible. In ruling upon the point Mr. Presiding Justice Lumpkin said: "In other words, there was, outside of the evidence objected to, proof authorizing the conclusion that the alleged conspiracy embraced a 'criminal enterprise' the scope of which included larceny, arson, and concealment. There was also some evidence warranting the inference that this enterprise was still pending on the occasions to which the evidence complained of as illegal related. It seems, therefore, under the decision of this court in *Byrd* v. *State,* 68 *Ga.* 661, that this evidence was admissible against Carter. In that case it was distinctly ruled that the acts and conduct of one accomplice during the pendency of the wrongful act, not alone in its actual perpetration, but also in its subsequent concealment, were admissible against another accomplice. This holding was doubtless based upon the idea that the criminal enterprise was still pending while the conspirators continued to be active in taking measures to prevent the discovery of the crime or the identity of those connected with its perpetration."

In *Rawlins* v. *State,* 124 *Ga.* 31 (12) (52 S. E. 1), this court held: "When in the trial of a murder case there is evidence tending to show that the accused on trial entered into a conspiracy to slay the deceased and others, the acts, conduct, and sayings of any of the conspirators while the conspiracy was in progress, and before the crime was committed, are admissible as evidence, as well as an

act of a conspirator other than the accused, after the commission of the crime, when the act sought to be proved was contemplated by the terms of the conspiracy to be performed after the perpetration of the crime was completed." In that case Milton Rawlins was on trial, and the testimony was objected to on the ground "that anything J. G. Rawlins did or said in the absence of Milton Rawlins was inadmissible against the latter," and yet the court permitted testimony "that on the morning after the killing J. G. Rawlins obtained a loan of $110 from a bank in Valdosta," there being evidence that Moore, an accomplice in the crime, was to receive $100 for his participation in the crime, and that this $100 was to be paid to him on the morning after the crime was committed. The rulings in the three foregoing cases are cited and approved in the more recent case of *Smith* v. *State,* 148 *Ga.* 332, 338 (96 S. E. 632). See *Wall* v. *State,* 153 *Ga.* 309-317 (112 S. E. 142). Our conclusion is that the evidence complained of was properly admitted, regardless of the rule with reference to conspiracy to which we have just referred, based upon numerous rulings of this court which require the guilt of a principal in the first degree to be established beyond a reasonable doubt, before a conviction of the principal in the second degree will be authorized. In days of stricter criminal pleading perhaps the rule could not have been so broadly stated; but now, when several persons are jointly indicted for murder, and any one of the accused may be convicted either of murder, either as principal in the first or second degree, or of any lesser offense of which one charged with the offense of murder may be convicted, it seems to be clearly established that one jointly indicted with another for murder as principal in the first degree may be convicted upon evidence showing his guilt as principal in the second degree, and that in such cases the rule always applicable to accessories before the fact becomes applicable, to wit, that the guilt of the principal in the first degree must be established. In the present case it may be said that the State had introduced the evidence of Noah Covington, who testified that he saw Tanner take deliberate aim and shoot down Tarbutton, the deceased. But this proof did not deprive the State of the right to prove the guilt of Tanner aliunde. There was evidence introduced for the purpose of impeaching the witness Covington. The

jury might discredit Covington, and might prefer to believe the inference arising from the testimony to which objection was made.

In *Kettles* v. *State*, 145 *Ga.* 6 (88 S. E. 197), it was held: "Where two persons are jointly indicted for murder, each may be convicted upon evidence showing that he was either the absolute perpetrator of the crime or was present aiding and abetting the other in its commission. As principals in the first and second degrees in the crime of murder are punished alike, no distinction between them need be made in the indictment." There was evidence in this case, that, while Rawlings was present, Tanner fired the shot which caused the death of the deceased. It devolved upon the State to satisfy the jury that in his presence Rawlings was aiding and abetting Tanner in the commission of the crime, for mere presence without participation in the crime does not authorize an inference of guilt. The evidence to which objections were made, with which we are now dealing, tended to raise an inference explanatory of Rawlings' presence at the time that Tanner shot, and might authorize the jury to find that Rawlings participated in the act of Tanner, and the intent with which the shot was fired (in case the jury found that the shooting was not accidental). Such a finding on the part of the jury would have authorized the conviction of Rawlings as a principal. That the State must prove. the guilt of the principal in the first degree, in order to authorize the conviction of another jointly indicted of the offense of murder as principal in the second degree, was held in *Jones* v. *State*, 64 *Ga.* 697. In that case it was held that "The conviction of one charged with crime as principal in the second degree is contrary to law where there is no evidence of the guilt of the principal in the first degree." Under the ruling in *Kettles* v. *State*, supra, and similar cases, one may now be convicted of murder as principal in the second degree, without the nature of the degree of the defendant's participation in the crime being alleged in the indictment; but this rule as to pleading does not affect the rule as to the sufficiency of the evidence which has just been quoted from the *Jones* case. As ruled by Mr. Chief Justice Warner in that case, the guilt of the principal in the first degree must appear either by the introduction in evidence of the record of his conviction or otherwise, or the conviction of one whom the State contends to be a principal in the second degree can not be sustained against the

objection that the finding is contrary to law. *Lewis* v. *State,* 136 *Ga.* 355 (2) (71 S. E. 417); *Jackson* v. *State,* 54 *Ga.* 439-440.

3. For the reasons given in the next preceding division it was not error to admit the testimony of Mell Brantley, as complained of in the ninth ground of the motion for a new trial, nor to submit to the jury the photograph identified by Brantley, of which complaint is made in the tenth ground. A different question might be presented had a different objection been offered, based upon one of the rulings relating to the introduction of evidence of experiments. The objection to Brantley's testimony, as shown in the ninth ground, was "that the statements of said witness were hearsay evidence, based on hearsay evidence, being based upon statements made by Tanner at the inquest the day after the homicide, and not in the presence of the defendant Rawlings." The objection urged to the introduction of the photograph was based upon hearsay evidence, etc., following the same language as just quoted.

4. We are of the opinion that the court erred in admitting in evidence the testimony of Heyman Joiner, to the effect that over thirty years before the trial the defendant Rawlings had stated to the witness that he had swapped places in Johnson County with the Tarbutton boys, who gave him $10,000 and paid every dollar of it in two years. The objection based upon the irrelevancy of this testimony should have been sustained. But inasmuch as, after a very painstaking study of every feature of this case, it does not appear to us that this evidence had a tendency to injure and damage the defendant or could have damaged him in any way, this error would not authorize a reversal of the judgment overruling the motion for a new trial.

5. The court did not err in overruling the objection to the admission of certain insurance policies of which complaint is made in the twelfth ground of the motion for a new trial. As appears from the statement of facts, these policies were delivered by Rawlings, under an order of the judge of the superior court of Washington County, to L. B. Holt, of Sandersville, Georgia, as a receiver duly appointed by that judge to take charge of all of the money, effects, and papers of the defendant Rawlings in a civil case pending in said court. The voluntary delivery of the policies by Rawlings was not made with reference to the instant criminal case. The policies were produced in the trial now under review

in response to a subpœna duces tecum, served upon Holt, the receiver. It is alleged in this ground of the motion that the defendant Rawlings was forced to surrender the policies to the receiver. The defendant objected to their admission in evidence, on the ground that, by the process employed to obtain them, he had been forced and compelled by legal process to give testimony tending to incriminate himself, and to furnish evidence against himself, in violation of the laws and constitution of the State of Georgia and of the United States, and particularly in violation of art. 1, sec. 1, par. 6, of the constitution of Georgia, and of the fifth amendment to the constitution of the United States. Under the ruling of this court in *Calhoun* v. *State,* 144 *Ga.* 679 (87 S. E. 893), and numerous subsequent decisions, the policies could have been used as evidence in this prosecution even if they had been taken by force from the person of Rawlings. But we do not think that under the facts in this particular instance the policies were inadmissible in that the defendant was compelled to incriminate himself or to introduce testimony against himself, even as this constitutional provision was construed by this court prior to the time when the decisions just referred to were rendered; nor was the admission of these policies in violation of the fifth amendment to the constitution of the United States as construed by the Supreme Court of the United States. The policies were not found by the superior court of Johnson County in the possession of the defendant, nor were they taken from his custody. At the time the subpœna duces tecum was issued they were in the possession of L. B. Holt, a citizen of this State, amenable to the processes of the courts of this State, and, so far as appears from the record, they were produced without objection on his part. The defendant was not forced to deliver the policies to the receiver at the time and under the circumstances of the delivery. As we have already stated, the issue as to the production of the policies, as being a violation of the constitution of Georgia, is foreclosed by previous decisions of this court; and since it appears that at the time the defendant parted with the policies there was no compulsion which necessitated their delivery to the receiver, the latter having produced them in accordance with law, the ruling of the trial judge was not in conflict with the provisions of the fifth amendment to the constitution of the United States, which declares that no per-

son "shall be compelled in any criminal case to be a witness against himself."

6.   In ground thirteen of the motion substantially the same objections were made as those presented to the admissibility of the evidence dealt with in the second division of this opinion.   Ray Huie testified to the conversation in jail, set forth in the statement of facts.   The objection to this testimony was "that Tanner was not on trial, and no statement made by Tanner was admissible as evidence against the defendant Rawlings, in which Rawlings did not consent and concur; and because the declaration of the alleged coconspirator Tanner, made after the conclusion of the enterprise, was admissible only as against himself, and not as against the defendant Rawlings; and because the defendant Rawlings did not concur or assent to the statement of said Tanner, but on the contrary expressly denied the same."   For the reasons already stated in the second division of this opinion, the admission of this testimony was not error so far as the last two reasons for the rejection of the testimony are concerned; and the first objection as stated is without merit, because the proposition "that no statement made by Tanner was admissible as evidence against the defendant Rawlings, in which Rawlings did not consent or concur," is not sound as matter of law.   Many statements made by Tanner with reference to the case, in which Rawlings did not consent or concur, would be admissible under well-settled rules of law, and the objection did not so specify in what particular respect the evidence was illegal and inadmissible, other than that Rawlings did not consent and concur, as to enable the trial court intelligently to pass upon the point.

7.   The writer is of the opinion that it was error to instruct the jury at all on the subject of confessions, inasmuch as the testimony of Ray Huie can not be construed as more than an inculpatory admission; and that such error, under the previous rulings of this court, requires the grant of a new trial.   *Dumas* v. *State,* 63 *Ga.* 601 (5); *Covington* v. *State,* 79 *Ga.* 687 (7 S. E. 153); *Fletcher* v. *State,* 90 *Ga.* 468, 471 (17 S. E. 100); *Nightengale* v. *State,* 94 *Ga.* 395 (21 S. E. 221); *Powell* v. *State,* 101 *Ga.* 9 (4), 18 (29 S. E. 309, 65 Am. St. R. 277); *Lee* v. *State,* 102 *Ga.* 221 (29 S. E. 264); *Davis* v. *State,* 114 *Ga.* 104 (8), 109 (39 S. E. 906); *Owens* v. *State,* 120 *Ga.* 296 (3) (48 S. E. 21);

*Shellman* v. *State,* 157 *Ga.* 788, 792 (122 S. E. 205). However, as appears from the seventh headnote, the court is equally divided upon the question thus raised in the fourteenth ground of the motion for a new trial; from which it results as matter of law that the judgment of the court below as to this ground of the motion stands affirmed by operation of law. Consequently, and inasmuch as we are all agreed that there was no reversible error in the preceding assignments of error, and the evidence adduced is sufficient to warrant the verdict, the judgment overruling the motion for a new trial should not be reversed.

*Judgment affirmed. All the Justices concur, except as to the question last stated.*