## SMITH *v.* THE STATE.

1. On the trial of one charged with murder, after the fact that a conspiracy to take the life of the deceased has been proved prima facie, the declarations of any one of the conspirators during the pendency of the criminal project are admissible in evidence against all.
(a) Whether a conspiracy is in fact established is a question for the jury, who give the evidence such weight as they may see fit under proper instructions.
(b) In the present case the fact of the existence of a conspiracy was sufficiently shown to authorize the charge discussed and set forth in the first division of the opinion.
(c) "Where inculpatory statements were made by a brother of the defendant in his presence and under circumstances which would warrant the inference that he heard them but did not deny them, they were admissible in evidence, the question whether they were so heard being left to the jury under proper instructions."
2. Where witnesses for the State on the trial of one charged with murder give evidence strongly tending to establish a conspiracy on the part of the defendant and the other conspirators, and subsequently to the conviction of the defendant on trial such witnesses make declarations under oath to the effect that their former testimony was false, such declarations are not cause for a new trial.
3. The following charge of the court was not erroneous for any reason assigned: "Circumstances satisfactorily proven, which point conclusively to guilt and which are irreconcilable with the innocence of the defendant, or which require explanations by the defendant and may be

explained by him if he is innocent, but which are not so explained, may be such as to satisfy a juror."

4. The evidence authorized the verdict, and the court did not err in refusing a new trial.

No. 866. AUGUST 15, 1918. REHEARING DENIED SEPTEMBER 14, 1918.

Indictment for murder. Before Judge Bartlett. Polk superior court. February 20, 1918.

*W.-W. Mundy* and *Bunn & Trawick,* for plaintiff in error.

*Clifford Walker, attorney-general, J. R. Hutcheson, solicitor-general, Ault & Wright,* and *M. C. Bennet,* contra.

HILL, J. Charley Smith, alias Boy Smith, was indicted jointly with Bob Smith, Bose Hudgins, and James Fortenbury, for the murder of Joe Moore. The State elected to sever. Charlie Smith was put on trial, and the jury returned a verdict of guilty against him, with recommendation of life imprisonment in the penitentiary, and a sentence was accordingly imposed. Being dissatisfied with the verdict and judgment, the defendant made a motion for new trial, which was overruled, and he excepted.

The evidence as to the homicide was entirely circumstantial, and showed a most horrible and brutal murder. The body of the deceased was found on July 26th, 1917, in what was known in the neighborhood as "Fiddlers Hollow," lying near the edge of the road in some bushes and near "Mineral Spring," close to the residence of James Fortenbury, one of the persons indicted, and about a mile from the residence of Charley Smith, the defendant. The body was horribly mutilated, the head being severed from it and partly buried about one hundred steps from the body, the breast and collar-bone and other parts of the body being gone. One witness, Cozzart, testified: "The part of the head I saw was from here up [indicating]. The face was gone, and if it was found I didn't see it. I found a bullet on the sheet when we were washing him. The body was rolled around on the sheet." A pool of blood was found in the middle of the road, and there was evidence that the body had been dragged from the road to near the edge of the road where it was found. On the morning following the murder, wadding from a gun and a pistol ball were found by persons who washed and dressed the body. A hole was found in the coat, as if made by a gunshot.

The evidence for the State showed that the deceased left home about dark on the night before his body was found the next morning. The testimony of the wife of the deceased was: "He said

he was going to Fiddlers Hollow to hide a still, Bob Smith's. The night before he left he come in the room where I was at, and said he would have to go, Mr. Hudgins was down there in the swamp waiting for him, . . and they wanted to get the still and worm out before it got so dark. They were going up Fiddlers Hollow and hide it. Bob Smith, he said, told him the revenues was coming in next morning at two o'clock. He said he would be back at midnight if he lived; and I asked him not to go, and he said he didn't want to go, he was afraid to go and afraid not to go. He said he was going to meet Bob Smith, Boy Smith (the defendant), Jim Fortenbury, Mr. Lewis, and Mr. Hudgins over there. That's all he told me that I remember. He said he would come back by midnight if he lived. He didn't come back. I was sick at that time. I didn't see the body afterward. I know the coat he wore off. Yes, that's the coat. When he left there was not a break in it, it was a new coat. This is half of the coat, the right side of it, this is the right sleeve. I saw my husband and Boy Smith together that afternoon; they come down the road together. He went to Boy Smith's that evening and come back with Boy. When they come back together Boy Smith, Bob Smith, and Mr. Hudgins and old man Lewis were with them. They stopped right in front of the house. . . They come down the road together and went on toward Bob Smith's. . . I heard dogs barking and the report of a gun that night. I heard one gun fire toward Fiddlers Hollow. They told me Mr. Moore's body was found next morning in Fiddlers Hollow. I dont know where the Mineral Spring is. I know where they say the body was. The gun fired from that direction. . . The gun was fired about eight o'clock, something like half an hour or an hour I reckon after Mr. Moore had gone. I don't know whether they moved the still that night or not; they said part of it was gone. I never seen it. He was making whisky for Bob Smith. I couldn't help knowing it. I seen them making the stills—Bob Smith. I seen Charley Smith around over there with him, Bob Smith, and Mr. Moore, working on the stills. The still they made was sitting right over in front of Bob Smith's barn. I dont know anything about more than one still. I saw smoke from two other stills, I dont know exactly how far apart. One of them was down in front of our house like; the other was in the corn patch, I dont know how far away, I never was down there. I seen smoke, was all I seen; it was between Bob

Smith's and Charley's house. I saw them making one still out there at Bob Smith's barn; he said the revenues cut it up. I seen them come after them to work, seen them start off from the house. They went in the direction of the still. That was toward Boy's house. I dont know how far from his house. I never was at Boy's house. I just passed there. Boy Smith is Charlie Smith; he goes by the name of Boy Smith. I reckon his real name is Charlie Smith; that's all I ever heard him called, Boy Smith."

W. W. Lewis testified: "I was at work over there, hired to Boy Smith. The evening before Joe Moore was killed I was at Boy Smith's, Charley Smith's. I saw Joe Moore that evening. We were up at Bob's house that evening, Bob and Boy and Bose Hudgins and— We got there between four and five o'clock. We didn't do anything there, just went and sat on the porch talking. Joe Moore's name was mentioned; he was at Bob's sitting on the porch. He didn't stay there all the time. I dont know where he went. He left between four and five o'clock. After we got there a little while Jim Fortenbury come up. That was before Joe Moore left, and that was when Bob done his talking. After Joe Moore went through the house Bob says, 'I had 8 gallons of whisky in my barn, and when I come back I had 8 gallons of water.' He says, 'Mr. Lewis, did you get it?' I says, 'No, I never got it.' He says, 'Some God-damned rascal got it. We are going to kill Joe Moore to-night, and if you tell it we will kill you.' I stood there a few minutes. That was all that was said."

C. B. Fortenbury, the father of Jim Fortenbury, testified: "I have talked with Charlie Smith, or Boy Smith, with reference to Joe Moore. I don't remember how many days it was, but a short time before Joe Moore was killed was the last talk me and him ever had about it. The conversation was between Bob's and Boy's somewhere, a place known as the pine tree. We was going along the road near that pine tree, and I asked Boy what kind of luck he had. He said he had had. bad. luck. We were talking about whisky, making a run. He said it was about like the other was. He said they had put some salt in it, or preserving powders, one, and that nobody but Joe Moore put it in; and he says, 'I am going to talk to him, and he can't live on the Smith estate; he has got to move. He won't be here when the United States court sets; now see if he is.' I do not know when the U. S. court was to set; it was set after Moore was killed. . . I heard about the revenue

officers arresting Joe Moore. He was arrested up the branch right where I was arrested, at the same time. That was. Bob's still. I expect it was half a mile from Charlie's still. . . Boy used Bob's still before the revenues made the raid. . . Next morning while going to the funeral Bob had a talk with me. He asked me if I remembered hearing him tell me about taking care of his men; and I told him I did. He says, 'I meant that,' and he says, 'The man that killed Joe Moore saved me the job.'. He says, 'I intended to kill him before the United States court set; and now, Charlie, if there is anything said, anything dropped out in this country that will throw suspicion on me and Boy, I will hear it, and he will go just like that damned son of a bitch went; he will be hauled off.' Boy is Charlie Smith. . . We was up there in jail, talking, and Boy asked me what did I know against him. I told him I didn't know anything against him in this murder. I says, 'As far as I know, my evidence, you can go back home,' and went on and told him what I told here yesterday about this conversation; and he asked me to screen him all I could, and not tell no more than I had to. I told him I had done swore this up here, and would have to answer the questions if they asked me."

Mansell Moore, a son of the deceased, testified that he lived at Bob Smith's, a brother of Charlie Smith. Charlie lived about one quarter mile back down the road from Bob. The deceased was working for Bob. He was making whisky for Bob Smith. When he left home that night he came in the cook-room and told witness to keep his supper warm, he would be back about midnight if he lived. There was evidence to the effect that both Charlie and Bob Smith had something on their clothes, the day after the homicide, which resembled blood spots. "They were tolerably clean, looked like they had been recently washed. The blood spots looked like they had tried to be washed off or something."

1. Error is assigned on the following charge of the court: "The State insists that the declarations insisted upon as having been made were made by one of the joint conspirators during the pendency of the pending act, as the State claims, of the criminal project, and in the presence and in hearing of the defendant Charlie Smith, and were such declarations as to incriminate the defendant on trial and to call for a repudiation on the part of the defendant, if not guilty, and that the defendant did not repudiate the statements of another person charged as a party to the conspiracy;

and the State therefore insists that such statement in his hearing should be considered in the investigation of this case. If you find from the testimony submitted, beyond a reasonable doubt, that there was a conspiracy between Bob Smith, Charley Smith, Bose Hudgins, and James Fortenbury to kill Joe Moore as charged in the indictment, that Joe Moore was killed in pursuance of such conspiracy, that one of the joint conspirators in the immediate presence of the defendant on trial and in his hearing made declarations and threats against the life of Joe Moore, that the incriminating statements then and there made by a co-conspirator in the hearing and presence of the defendant were such as to call for a repudiation and the defendant failed to repudiate such statements, then you may consider such statements along with the other evidence in the case in determining the guilt or innocence of the defendant." This charge is criticised as erroneous on the ground that there was not sufficient evidence of a conspiracy between the defendant and the other alleged conspirators to take the life of the deceased for the court to submit that issue to the jury. It is also insisted that there is no evidence to connect the defendant with the declarations of Bob Smith (who is jointly indicted) against the deceased, which would in law call for a repudiation by the defendant; and that the defendant did not make any statement about taking the life of the deceased, nor did any one else in the presence of the defendant, with his knowledge or consent, make any statement showing that the defendant had entered into a conspiracy to take the life of the deceased. There are also assignments of error on admitting, over objection of the defendant, certain testimony of W. W. Lewis, and other witnesses for the State, as to declarations of Bob Smith tending to show a conspiracy between the defendants jointly indicted in this case to kill the deceased. As the grounds of objection both to the charge and the admissibility of the evidence hinge upon the question of whether the evidence was admissible, and, if so, whether it was a sufficient basis for the charge excepted to, we will treat these assignments together. We have set out the evidence of some of the witnesses at length, and think it sufficient to authorize the jury to find that there was a conspiracy to kill the deceased and to keep secret the murder, and to warrant the charge of the court on the law of conspiracy. It is insisted that the court erred in admitting the evidence of the witness Lewis as to the statement of Bob Smith, made in the presence of Charlie

Smith, the defendant, on the afternoon before the killing occurred, as follows: "What did Bob [Smith] say? Tell how it came up and what Bob said. A. After Joe Moore went through the house Bob says, 'I had eight gallons of whisky in my barn, and when I come back I had eight gallons of water.' He says, 'Mr. Lewis, did you get it?' I says, 'No, I never got it.' He says, 'Some God-damned rascal got it. We are going to kill Joe Moore to-night, and if you tell it we will kill you.' I stood there a few minutes. That was all that was said." This statement which the witness said occurred in the presence of the defendant, and which he either heard or could have heard, and which was made under such circumstances as to warrant the inference that he did hear and did not deny it, was admissible in evidence; the question of whether it was heard being left to the jury under proper instructions. *Moye* v. *State*, 66 *Ga.* 740. It was admissible as tending to show a conspiracy on the part of those present who might come under the designation "we." After the fact of conspiracy is proved, the acts and declarations of any one of the conspirators during the pendency of the criminal project are admissible in evidence against all. Penal Code (1910), § 1025; *Carter* v. *State*, 106 *Ga.* 372 (5), 376 (32 S. E. 345, 71 Am. St. R. 262); *Rawlins* v. *State*, 124 *Ga.* 31 (12), 46 (52 S. E. 1); *Byrd* v. *State*, 68 *Ga.* 661 (1). Whether a conspiracy was in fact established was a question for the jury; but there was enough evidence prima facie tending to show a conspiracy to authorize the admission of the evidence objected to, the jury to give the evidence such weight as they saw fit in case the conspiracy was established. *Rawlins* case, supra. We think the fact of the existence of a conspiracy was sufficiently proved prima facie in order to admit the declarations of the co-conspirator.

2. A new trial is asked on the ground that the wife and son of the deceased, both of whom on the trial gave evidence tending strongly to establish the fact of a conspiracy on the part of the defendant and the other conspirators, had, since the trial, made declarations under oath to the effect that their former testimony was false. It has been held by this court that such declarations are not cause for a new trial. *Clark* v. *State*, 117 *Ga.* 254 (8) (43 S. E. 853); *Jordan* v. *State*, 124 *Ga.* 417 (52 S. E. 768); *Rogers* v. *State*, 129 *Ga.* 589 (3) (59 S. E. 288).

3. Error is assigned on the following charge of the court: "Circumstances satisfactorily proven, which point conclusively to guilt

and which are irreconcilable with the innocence of the defendant, or which require explanations by the defendant and may be explained by him if he is innocent, but which are not so explained, may be such as to satisfy a juror." This charge is not open to the criticism that it intimates an opinion of what has been proved, that the circumstances proved were strong, and that the defendant had not explained them. Nor is it open to the objection that the charge was not authorized by the evidence. *Young* v. *State,* 95 *Ga.* 456 (4) (20 S. E. 270).

4. We think the case was fairly submitted to the jury, that the evidence authorized the verdict, and the court did not err in refusing a new trial. Other assignments not specially dealt with are without substantial merit.

*Judgment affirmed. All the Justices concur.*