### 30638. BIRT v. THE STATE.

HILL, Justice.
This is a death case. Following trial by jury in Jefferson County, Billy Sunday Birt was found guilty of one count of burglary, two counts of armed robbery by use of offensive weapons and two counts of murder. He was sentenced to twenty years for burglary, to life for each of

the offenses of armed robbery (to be served concurrently), and to death for each of the offenses of murder. These offenses all related to Mr. and Mrs. Reid Oliver Fleming Sr., and occurred on December 22, 1973. The defendant was found not guilty of the December 21st burglary of the home of Jerry Haymon.

The case is before this court on appeal and for review of the death sentences. The state presented evidence from which the jury was authorized to find the following:

Carswell Tapley was employed by George Leisher on Leisher's farm in Washington County, Georgia. Leisher lived in Marietta and operated a used car lot. He made occasional visits to his farm. In late 1973, Leisher informed Tapley that if Tapley knew anyone who had money, Leisher knew some men who would "look into it" and pay 20% for help in "setting up a job." Tapley informed Leisher that a Mr. Fleming kept from $50,000 to $60,000 in his home.

Leisher saw Billy Wayne Davis, also in the used car business and formerly a business partner of Leisher's, and informed him that Tapley had information for him and gave Davis Tapley's phone number and a means of identification, the code word "hogs."[1]

When Leisher returned to the farm he told Tapley that he had gotten "in touch with the boys" who would contact Tapley shortly. Later, a person who identified himself as Jim Gordon called Tapley and stated he was calling from Leisher's car lot. The caller said he would be by for Tapley at nine o'clock that evening "to go get the hogs." Upon his arrival Tapley showed him the Flemings' residence in Wrens. Gordon asked Tapley what he knew about Jerry Haymon and where he lived.

According to Davis, a few days later Birt described

---

[1]Tapley, Leisher and Davis testified for the state after being granted immunity. Neither Tapley nor Leisher identified defendant Birt in their testimony. According to Davis' testimony, defendant Billy Sunday Birt had previously told Davis that he would be well paid for such information, and Davis passed the information to the defendant and instructed him how to contact Tapley.

two houses in Wrens, Georgia, to Davis. Davis contacted Larry Bethune who operated a body shop in Austell, and asked Bethune if he wanted to "pick up some money." Bethune indicated interest and on December 19, 1973, Bethune followed Davis to Wrens. Once they reached Wrens, Bethune got into Davis' car in which they drove by the Fleming residence and stopped at Haymon's filling station. An unfamiliar car was in the Fleming driveway and they left Wrens.

According to Davis, on Friday, December 21, 1973, Birt called Davis and asked him to come to a motel in Atlanta. Davis found Birt, Bobby Gaddis and Charles Reed at the motel. Girt explained to Davis that the three of them were planning a trip to Wrens to "take care of the business." Birt borrowed a car from Davis for the trip and also borrowed Davis' pistol.

The following morning, Saturday, December 22, 1973, Birt was waiting when Davis arrived at his car lot in Austell. According to Davis, Birt said that he had been awake all night, and that he planned to get some rest before going back to Wrens that evening. Further, Birt told Davis that he needed to have another car, as the one he had borrowed had already been seen in Wrens.

On Saturday afternoon, December 22, 1973, Davis took his car to Bethune to swap. When Bethune examined the trunk, it contained three guns and some coins which were identified as being stolen from Jerry Haymon's house. Bethune traded with Davis who received a 1971 green Cadillac, which, according to Davis, he turned over to defendant Birt.

Before Mr. Fleming closed his used car business on December 22, 1973, Bobby Gene Gaddis went to the car lot and made inquiries about a pickup truck. A customer who was in Mr. Fleming's office at the time made an in-court identification of Gaddis in a lineup.

In the early morning hours of Sunday, December 23, 1973, Davis drove a motor home to the interchange at I-20 and Route 11 where he met Birt, Gaddis, and Reed at about 2 a.m. Birt revealed that they had had difficulty in Wrens and had killed the Flemings. He said they had tortured Mr. Fleming to make Mrs. Fleming divulge where their money was hidden.

Davis asked for the return of his pistol and Reed remembered last seeing it in the Flemings' home. According to Davis, he and Birt and Gaddis then drove the '71 Cadillac to Wrens to retrieve the gun. Approximately twelve miles outside of Wrens they experienced car trouble and Birt flagged down a passing car by use of his flashlight.

About 4 a.m. on December 23, 1973, Mr. John Alley was flagged down by at least two motorists with car trouble a few miles outside Wrens, Georgia. Mr. Edgar Chance who worked with Mr. Alley also stopped. Defendant Birt accompanied Mr. Chance and Mr. Alley to their place of employment to obtain jumper cables. They both identified Birt. Mr. Chance identified the automobile used by Birt as a Cadillac and testified that Birt stated that they were going to Florida.

Davis testified further that after the car was started, Davis, Gaddis and the defendant proceeded to the Fleming residence, where Davis obtained tools to repair the Cadillac from the Flemings' garage. Birt failed to find the missing pistol in the Fleming home but later found it down the road where the Flemings' automobile had been abandoned.

They repaired the Cadillac and left Wrens. En route back to the motor home at I-20 and Route 11, Birt and Gaddis described the events of that evening to Davis. According to Davis they said that after dark defendant Birt, Gaddis and Reed approached the Fleming residence. When Mr. Fleming responded to their knocks at his door they told him they wished to purchase the pickup truck Gaddis had looked at earlier. When Mr. Fleming told them to return in the daylight hours, they forced their way into the house and proceeded to tie their victims. While Gaddis stood guard, Birt and Reed drove the Cadillac and the Flemings' car down a side road away from the Fleming home and returned in the Flemings' automobile. They then proceeded to torture Mr. and Mrs. Fleming. With mirth they reported to Davis that Mrs. Fleming was hard of hearing but that her hearing improved considerably when a coat hanger was tightened about her throat. Gaddis and Birt also told Davis that they had obtained $4,000 from the Flemings. The money

had been buried in fruit jars in the Flemings' smokehouse.

Davis drove the motor home and Birt and Gaddis followed Davis to Austell, where Birt paid Davis $850 in cash for a car. Birt insisted that the bill of sale be made out to his son. The only witness for the state who testified as to the events of the night of December 22 and morning of December 23, with the exception of Mr. Alley and Mr. Chance, was Billy Wayne Davis.

On Sunday morning, December 23, 1973, when his father failed to attend church services, Hugh Fleming drove to his parents' home to investigate. Arriving at their residence, Hugh recognized that something was wrong when he found that the back door was unlocked and that the interior of his parents' home had been ransacked. Hugh found his 73-year-old mother lying face down on her bed with a coat hanger twisted around her neck. Hugh reported to law enforcement officials and they found his 75-year-old father at the foot of his wife's bed. The elder Fleming had a coat hanger and the cords to an electric drill and an electric clock wrapped around his neck. The hands and feet of both victims had been bound by bedsheets.

Dr. Larry Howard of the State Crime Laboratory performed the autopsies on Mr. and Mrs. Fleming. Dr. Howard determined that Mr. Fleming's death was due to strangulation performed quite abusively. Dr. Howard found severe abrasions and contusions around the throat of the deceased. He also observed two lines on Mr. Fleming's throat which were caused by repeated applications of a ligature. There were multiple hemorrhages about the throat, face and scalp. In addition, Dr. Howard noted abrasions on the deceased's right ear and cheek, as well as multiple contusions about Mr. Fleming's eyes. Dr. Howard observed that other head injuries were possibly caused by multiple impacts of Mr. Fleming's head against the floor. Dr. Howard also noted that Mr. Fleming's left thumb nail was split down the middle. The injuries to the structure of Mr. Fleming's throat, and the signs of oxygen deprivation, indicated that there were several episodes of asphyxia due to oxygen deprivation prior to Mr. Fleming's death. The injuries around Mr. Fleming's neck indicated that his

bonds were tightened, and loosened, only to be tightened again.

Mrs. Fleming's death also resulted from strangulation. Dr. Howard noted that her eyes were bulging and hemorrhaged and that her tongue was pushed forward. He noted a bruise on her neck that had been caused by the friction created by the rubbing of the coat hanger around her neck. Blood and fluid were found in Mrs. Fleming's nose and mouth.

Dr. Howard concluded that the deaths of the two victims were not instantaneous, but resulted from prolonged episodes of abuse. He expressed the opinion that the time of death was about 10 to 11 p.m. on December 22.

Police officers testified that the Flemings' home had been completely ransacked, that the lock on the smokehouse door had been broken and that fruit jars were found inside, and that the Flemings' Ford automobile was found about 2 miles from their home.

The defendant offered his own testimony and that of four alibi witnesses. His witnesses testified that he was at his home in Winder from six p.m. until after eleven p.m. on the evening of December 22, 1973. The defendant's wife testified that he did not leave the house until 2:30 a.m., December 23, 1973, when Davis arrived.

The defendant testified that he wanted to buy his fourteen-year-old son an automobile for Christmas, that he went to Davis' car lot on Thursday, December 20th to do so, that he picked out a car needing body work which Davis agreed to have done by Monday, that Davis arrived at his home in Winder at 2:30 a.m. on Sunday morning, December 23, saying he was about to leave town and if Birt wanted the automobile he would have to come to the lot in Austell and get it now, that en route to the lot Davis asked Birt to look in the glove compartment for his pistol, that the pistol was not there, that Davis turned around and started toward Athens, stating that he had to go to Wrens, that the car developed fan belt trouble, that only the two of them were in the car, that after they cut a loose piece off the fan belt the car would not start, that two passersby stopped, that Birt rode with them to get jumper cables, that he said they were going to Florida because he

would have appeared foolish to say he didn't know where he was going, that after they got the car started they drove to where a Ford was parked, that Davis retrieved his pistol, that they then drove to Austell and went to Davis' car lot, and that Birt paid $850 cash for the car, part of which amount he had borrowed earlier from OG Finance Company in Winder. He stated that he returned to his home in Winder, arriving there about 9:30 or 10 a.m. Sunday morning. He acknowledged knowing Gaddis and Reed since childhood. He denied robbing or killing the Flemings.

In rebuttal, a witness for the state testified that he owned Colonial Finance Company which acquired OG Finance three years earlier, that he had searched the records, and that neither OG Finance nor Colonial made a loan to defendant Birt. The defendant took the stand again and testified that he got the loan from a Mr. Sheppard who used to work for OG Finance before he started his own finance company.

1. Defendant urges that the trial court erred in admitting into evidence over objection, and in failing to strike on motion, the testimony of witnesses Tapley, Leisher and Davis, because they admittedly were conspirators with each other and alleged conspirators with defendant but there was no other evidence to prove the conspiracy independent of their testimony. As can be seen, defendant's first enumeration deals with admissibility of evidence.

The defendant urges that the testimony of Davis, Tapley and Leisher cannot be used to prove the fact of conspiracy and that the remainder of the evidence did not prove the conspiracy. Absent the testimony of Davis, Tapley and Leisher, the remainder of the evidence bearing on the alleged conspiracy would be as follows: The Flemings were horribly murdered on the night of December 22. The lock on the smokehouse had been broken and fruit jars were found on the dirt floor. Their car was located about 2 miles away from their home. Gaddis had been seen at Mr. Fleming's car lot on the afternoon of December 22. Defendant Birt was seen on the road about 12 miles from Wrens at about 4 a.m. on December 23 in company with at least one other person. It

is true, as defendant contends, that absent the testimony of Tapley, Leisher and particularly Davis, the evidence does not prove a conspiracy. However, certain portions of their testimony are admissible.

Code Ann. § 38-306 deals with admissibility (Cf. Code Ann. § 38-121, which deals with sufficiency). Code Ann. § 38-306 is an exception to the rule which prohibits the admission into evidence of hearsay. See Code Ann. § 38-301.

Code Ann. § 38-306 provides: "After the fact of conspiracy shall be proved, the declarations by any one of the conspirators during the pendency of the criminal project shall be admissible against all." This Code section deals with the admissiblity of declarations of one conspirator upon the trial of another conspirator. Contrary to defendant's contention, it does not render all testimony by a conspirator inadmissible until the fact of the conspiracy be proved by independent evidence. It does not render a conspirator incompetent to testify as to facts; it simply prohibits a conspirator from testifying as to declarations made by one conspirator outside the presence of, and upon the trial of, another conspirator. "The testimony of a coconspirator as to facts within his knowledge involves no hearsay problem, since the statements are given on the stand and are open to cross examination." Developments in the Law of Criminal Conspiracy, 72 Harv. L. Rev. 922, 984 (1959).

Moreover, Code Ann. § 38-306 does not render Davis' testimony as to defendant Birt's declarations inadmissible upon Birt's trial. *Wall v. State,* 153 Ga. 309 (2) (112 SE 142) (1922). Davis' testimony that Birt admitted that he, Gaddis and Reed committed the two murders, is admissible at Birt's trial as an admission of guilt just as a confession by Birt to a law enforcement officer would be admissible as against Birt. See Code Ann. § 38-414. Statements by Gaddis to Davis made in Birt's presence during their conversations in the car following the murders are also admissible against Birt. *Smith v. State,* 148 Ga. 332 (1c) (96 SE 632) (1918).

Considering Davis' testimony as to facts (e.g., his several meetings and trips with Birt) and Birt's declarations as testified to by Davis made at the motel on

December 21, at Davis' car lot on the morning of December 22, at the motor home on I-20 at 2 a.m. on December 23, and Birt's and Gaddis' admissions during the trip from the motor home to the Fleming home and car and back to the motor home, there was more than ample evidence to prove the conspiracy and render the testimony of Tapley and Leisher and any remainder of Davis' testimony, admissible.

As stated in *Chappell v. State,* 209 Ga. 701, 702 (75 SE2d 417) (1953), the existence of a criminal conspiracy may be shown by direct or circumstantial evidence. Davis provided direct evidence of the conspiracy in this case.

The fact that Tapley and Leisher testified prior to Davis' taking the witness stand does not create reversible error. *Barrow v. State,* 121 Ga. 187 (2) (48 SE 950) (1904); *Harrell v. State,* 121 Ga. 607 (3) (49 SE 703) (1904); *Wall v. State,* 153 Ga. 309 (3) (112 SE 142) (1922).

Defendant cites four cases which he argues stand for the proposition that a conspiracy cannot be shown by the testimony of a conspirator but must be shown by independent proof. *Wall v. State,* supra; *Lanier v. State,* 187 Ga. 534 (1 SE2d 405) (1939); *Pritchard v. State,* 224 Ga. 776 (164 SE2d 808) (1968); and *Caldwell v. State,* 227 Ga. 703 (182 SE2d 789) (1971). He relies particularly on *Wall v. State,* supra, where the court said (p. 318): "The criminal conspiracy can not be shown by declarations of alleged conspirators, not in the presence of, and without the knowledge of, others sought to be bound thereby; but must be established by aliunde proof sufficient to establish prima facie the fact of conspiracy between the parties." *Wall* did not involve any declaration by defendant Wall. *Wall* holds that the conspiracy cannot be shown by declarations of alleged conspirators not the defendants and not in the presence of and without the knowledge of the defendants on trial. *Wall* held that a witness could testify as to a declaration made by co-defendant Lewis who was tried jointly with Wall.

*Lanier v. State* and *Pritchard v. State,* supra, relied upon by the defendant, involved the sufficiency of the evidence to corroborate the testimony of the accomplice. Although *Caldwell v. State,* supra, discusses both admissibility and sufficiency, it found the corroboration

insufficient and hence the testimony of the conspirators to be inadmissible. In our view, the question of admissibility should be kept apart from the question of sufficiency, which latter question we turn to next, after stating that the trial court did not err in admitting, and in overruling the motion to strike, the testimony of Davis, Tapley and Leisher.

2. Defendant's second enumeration of error is that the trial court erred in overruling his motion for directed verdict and in overruling his motion for new trial on the general grounds in that there was not sufficient evidence to corroborate the testimony of accomplice Davis so as to connect the defendant with the crimes.

Code Ann. § 38-121 provides that the testimony of a single witness is generally sufficient to establish a fact, except that to convict in any case of felony where the only witness is an accomplice, corroborating circumstances are required. This Code section deals with the sufficiency of the evidence (testimony and corroboration) to convict in felony cases where an accomplice testifies as a witness.

The leading case interpreting and applying this Code section and the cases decided under it is *West v. State,* 232 Ga. 861 (2) (209 SE2d 195) (1974), which should be considered in full and which we quote in part (pp. 864, 865): "The law is settled in Georgia that the corroborating facts or circumstances must connect the defendant to the crime or lead to the inference that he is guilty, and that such corroboration must be independent of the accomplice's testimony. *Allen v. State,* 215 Ga. 455 (111 SE2d 70); *Price v. State,* 208 Ga. 695 (69 SE2d 253). . .

"When an accomplice's testimony is corroborated in material part, other uncorroborated testimony may be believed by the jury, with one important exception. Under § 38-121, testimony which concerns the identity of other participants must be corroborated by some means independent of the testimony of the accomplice. One who is guilty of a crime in which he participated will always be able to relate the facts of the case and if the corroboration goes only to the truth of that history, without identifying the person accused, it is really no corroboration at all.

"Therefore, a distinction must be made between evidence which tends to prove the truth of the

accomplice's general testimony and that which tends to prove the identity and participation of the accused... [A]n accomplice's testimony is more believable when it is corroborated in material part. But insofar as the participation and identity of the accused is concerned, there must be independent corroborating evidence which tends to connect the accused with the crime.

"Simply because an accomplice's testimony is corroborated in most details, it does not follow that his testimony alone as to the identity and participation of the accused is sufficient to justify conviction." A host of cases can be found in support of this decision. See *Allen v. State,* 215 Ga. 445 (2) (111 SE2d 70) (1959), and cases cited.

Thus, regarding sufficiency (as opposed to admissibility) the testimony of an accomplice must be corroborated by independent evidence as to the identity and participation of the accused which tends to connect the accused with the crime or leads to the inference that he is guilty. As stated in *Allen v. State,* supra, the corroborating facts and circumstances must do more than merely cast on the defendant a grave suspicion of guilt.

Davis' testimony as to the history of these crimes is amply corroborated by other evidence.

Moreover, Davis' testimony as to defendant Birt's identity and participation in the murders is corroborated by the testimony of the two men who identified Birt as being in a disabled Cadillac about 4 a.m. and 12 miles from Wrens, within a few hours of the murders and about 100 miles from Birt's home in Winder. The testimony of these two independent witnesses corroborates Davis' testimony, tends to connect the accused with the crime and leads to the inference that he is guilty.

Davis' testimony as to Birt's identity and participation is further corroborated by Birt's testimony that he and Davis went to the Flemings' abandoned car and retrieved Davis' pistol.

The corroborating evidence as to Birt's identity and participation in the crimes was sufficient to satisfy the requirement of Code Ann. § 38-121 that such corroboration do more than tend to cast a grave suspicion of guilt on the accused, and was sufficient to tend to connect the accused with the crime and lead to the

inference that he is guilty.

The defendant urges that his testimony showed his reason for being in a disabled Cadillac 12 miles from Wrens at 4 a.m. on Sunday morning. He urges that the evidence corroborating Davis' testimony was thus explained. However, defendant's testimony seeking to explain the evidence of corroboration could not dispel that evidence; it merely made a question for the jury to decide. See *Harris v. State,* 236 Ga. 242, 244 (1976). The jury found against the defendant's explanation of the corroborating evidence.

As was stated in *Brown v. State,* 232 Ga. 838, 840 (209 SE2d 180) (1974): " 'It is not required that this corroboration shall of itself be sufficient to warrant a verdict, or that the testimony of the accomplice be corroborated in every material particular. *Taylor v. State,* 110 Ga. 151; *Dixon v. State,* 116 Ga. 186. Slight evidence from an extraneous source identifying the accused as a participator in the criminal act will be sufficient corroboration of the accomplice to support a verdict. *Evans v. State,* 78 Ga. 351; *Roberts v. State,* 55 Ga. 220. The sufficiency of the corroboration of the testimony of the accomplice to produce conviction of the defendant's guilt is peculiarly a matter for the jury to determine. If the verdict is founded on slight evidence or corroboration connecting the defendant with the crime, it can not be said, as a matter of law, that the verdict is contrary to the evidence. *Chapman v. State,* 109 Ga. 165.' *Hargrove v. State,* 125 Ga. 270, 274 (54 SE 164); *Slocum v. State,* 230 Ga. 762 (3) (199 SE2d 202)."

The evidence corroborating the testimony of the accomplice was sufficient to warrant submitting the case to the jury and the trial judge did not err in overruling the defendant's motion for directed verdict or in overruling his motion for new trial on the general grounds.

3. Defendant argues that the trial court erred in overruling his motion for directed verdict on the armed robbery counts in that there was no competent evidence to show that any money was taken or the amount of money taken.

Davis testified that Birt and Gaddis told him that after torturing Mr. Fleming to make Mrs. Fleming

disclose where the money was hidden, $4,000 was found buried in fruit jars in the Flemings' smokehouse. This testimony was corroborated by the physical evidence at the scene of the crimes. Davis' testimony that Birt paid him $850 cash for a car on the morning of December 23 was corroborated by the bill of sale signed in the name of the defendant's 14-year-old son. "It is not required that this corroboration shall of itself be sufficient to warrant a verdict, or that the testimony of the accomplice be corroborated in every material particular." *Brown v. State,* supra.

The trial court did not err in failing to direct a verdict as to the armed robbery counts.

4. Defendant urges that the trial court erred in not requiring the state to elect which charge of armed robbery, of Mr. Fleming or Mrs. Fleming, would be submitted to the jury. He urges that the evidence will not support both armed robbery convictions in that there is no evidence to show which victim owned or possessed the money or which victim died first.

The evidence was sufficient to support a conviction for armed robbery. *Clements v. State,* 84 Ga. 660 (1) (11 SE 505) (1890); *Welch v. State,* 235 Ga. 243 (1) (219 SE2d 151) (1975); *Moore v. State,* 233 Ga. 861, 864 (213 SE2d 829) (1975). Although the state sufficiently established the taking of the money, the state was unable to show in this case from which victim the money was taken. Under these circumstances, the trial judge did not err in overruling the motion to require the state to elect. Apparently no jury instructions regarding this matter were requested and none were given. Under the circumstances of this case and in view of the lack of evidence on this point, one conviction for armed robbery should be set aside upon remand. See *Creecy v. State,* 225 Ga. 542 (5) (221 SE2d 17) (1975); *Jackson v. State,* 236 Ga. 98 (222 SE2d 380) (1976).

The defendant cites *Davis v. State,* 100 Ga. App. 308, 313 (111 SE2d 116) (1959), which would indicate that where a defendant is convicted of two offenses, one included within the other as a matter of fact, a new trial as to both is required. However, even the *Davis* opinion notes that where the evidence shows only a single crime and where the jury is instructed as to two crimes and returns

guilty verdicts as to both, the error would have become harmless if the trial court had imposed sentence upon the defendant only for one offense. Id., p. 311.

Rather than require new trials as to both armed robbery counts, one armed robbery conviction should be set aside. *Creecy v. State,* supra; *Jackson v. State,* supra.

5. Defendant urges that the trial court erred in failing to give the charge he requested on impeachment of witnesses and erred in the charge given on impeachment by charging that a witness could be impeached by conviction of a felony but by failing to give a definition of "felony."

Defendant's request to charge on impeachment was general in its terms, and did not request a definition of "felony." The charge given by the court substantially covered the subject of impeachment and we find no error in the court's failure to give the charge requested by the defendant. *Leutner v. State,* 235 Ga. 77 (5) (218 SE2d 820) (1975), and cits.

As noted above, defendant did not request a definition of "felony." The evidence showed that witness Davis had pled guilty to the charge of possession of counterfeit money and was serving a 20-year sentence for bank robbery (see United States v. Gaddis, — U. S. — (96 SC 1023, 47 LE2d 222) (1976)). The jury was instructed generally as to credibility of witnesses and impeachment. In a criminal case it is the duty of the trial judge, with or without request, to give the jury appropriate instruction as to the law on each substantive point or issue involved in the case, but the trial court is not required to charge, without request, as to any collateral matter. *Driver v. State,* 194 Ga. 561 (1) (22 SE2d 83) (1942).

It is not error for the trial court to fail to charge, without request, the law relating to the subject of impeachment. *Wiley v. Wiley,* 231 Ga. 798 (1) (204 SE2d 170) (1974) and cits. The subject of impeachment being a collateral matter not required to be given in charge without request, it follows that the definition of the word "felony" in a charge on impeachment is also a collateral matter not required to be given in charge in the absence of request. See *Perren v. State,* 69 Ga. App. 417 (3) (25 SE2d 823) (1943).

In the case of *Edwards v. State,* 233 Ga. 625 (212 SE2d 802) (1975), the trial court failed to charge the elements of a felony in a felony murder case. In *Edwards,* the felony issue was one of the substantive issues involved in the case. *Edwards v. State,* supra, is distinguished from the case before us by the nature of the issues involved. Perhaps it should be noted, however, that the court below did define the word "felony" in charging the jury as to the crimes charged against this defendant.

We find no error in the trial court's charge on impeachment.

6. The defendant challenges the constitutionality of the Georgia death penalty statute. That statute (Ga. L. 1973, pp. 159-172, Code Ann. § 27-2534.1), has been attacked with regularity since its enactment. Beginning with the first case considered by this court under that statute (*Coley v. State,* 231 Ga. 829 (204 SE2d 612) (1974)), the statute has been upheld against all general attacks. But see *Arnold v. State,* 236 Ga. 534 (1976). An attack similar to one raised here was overruled in *Smith v. State,* 236 Ga. 12 (5) (222 SE2d 308). This enumeration is found to be without merit.

7. Sentence Review: To authorize affirmance, the death penalties imposed in this case must conform to the standards set forth in Code Ann. § 27-2534.1. This court must determine (a) whether the sentences of death were imposed under the influence of passion, prejudice, or any other arbitrary factor; (b) whether the evidence supports the jury's findings of statutory aggravating circumstances; and (c) whether the sentences of death are excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. Code Ann. § 27-2537 (c) (1-3).

We have reviewed the trial transcript and record and have made a comparison of the evidence and sentences in similar cases pursuant to the mandate of the statute. The cases considered by the court in this review are listed in an appendix attached to this opinion. Using the standards prescribed for our review by the statute, we conclude that the sentences of death imposed in this case were not imposed under the influence of passion, prejudice or any other arbitrary factor.

In recommending the death penalty as to both murder counts the jury found as follows: (1) The offense of murder was committed while the offender was engaged in the commission of another capital felony, armed robbery (Code Ann. § 27-2534.1 (b) (2)); (2) The offense of murder was outrageously or wantonly vile, horrible or inhumane in that it involved torture or depravity of mind (Code Ann. § 27-2534.1 (b) (7)); and (3) The offender committed the offense of murder for himself or another, for the purpose of receiving money or any other thing of monetary value (Code Ann. § 27-2534.1 (b) (4)).

The evidence supports the jury's findings of statutory aggravating circumstances as to each of the counts of murder. After considering both the crimes and the defendant and after comparing the evidence and sentences in this case with those of previous murder cases reviewed, we are of the opinion that the sentences of death in this case are not excessive or disproportionate to the penalties imposed in similar cases.

The sentences of death imposed in this case are affirmed.

*Judgment affirmed in part and reversed in part with direction. All the Justices concur, except Gunter, J., who dissents.*

ARGUED JANUARY 13, 1976 — DECIDED APRIL 20, 1976 — REHEARING DENIED MAY 17, 1976.

*O. L. Collins,* for appellant.

*H. Reginald Thompson, District Attorney, Arthur K. Bolton, Attorney General, Lois F. Oakley, Assistant Attorney General,* for appellee.

### APPENDIX.

Similar cases considered by the court: *Pass v. State,* 227 Ga. 730 (182 SE2d 779) (1971); *Callahan v. State,* 229 Ga. 737 (194 SE2d 431) (1972); *Scott v. State,* 230 Ga. 413 (197 SE2d 338) (1973); *Kramer v. State,* 230 Ga. 855 (199 SE2d 805) (1973); *Bennett v. State,* 231 Ga. 458 (202 SE2d 99) (1973); *Howard v. State,* 231 Ga. 186 (200 SE2d 755) (1973); *Hunter v. State,* 231 Ga. 494 (202

SE2d 441) (1973); *Morgan v. State,* 231 Ga. 280 (201 SE2d 468) (1973); *House v. State,* 232 Ga. 140 (205 SE2d 217) (1974); *Gregg v. State,* 233 Ga. 117 (210 SE2d 659) (1974); *Floyd v. State,* 233 Ga. 280 (210 SE2d 810) (1974); *Moore v. State,* 233 Ga. 861 (213 SE2d 829) (1975); *Smith v. State,* 236 Ga. 12 (222 SE2d 308) (1976).