### 70653. SPARKS v. THE STATE.
(335 SE2d 298)

BIRDSONG, Presiding Judge.

Willie Rufus Sparks was convicted of an attempt to commit armed robbery and two counts of armed robbery. He was sentenced to two concurrent terms of 20 years for the armed robbery counts and 10 years for the attempted armed robbery to run concurrently, the sentence requiring Sparks to serve 16 years with four years probation to

follow the confinement. Sparks enumerates four asserted errors. *Held*:

1. In his first enumeration, Sparks argues that the evidence, being all circumstantial as regards his alleged participation in the crimes charged, was legally insufficient when the weaknesses in the testimony and motivation of the two accomplices are taken into account. Indeed no witness outside of the accomplices was able to place Sparks at the scene of any of the crimes and no one was able to identify him.

In considering this enumeration, we conclude the facts available to the jury reflect the following. Sometime shortly after midnight on July 5-6, a young black male with a white cloth over his face dressed in a red T-shirt turned inside out and with black lettering upon it, waving a gun, appeared at the door of a convenience store demanding money. The clerk was in the process of counting the money and had closed and locked the door. Upon seeing the putative robber, the clerk dropped to the floor and managed to call the police. The robber being unable to enter the store fled the scene.

A few minutes later at a second all-night convenience store a few blocks removed from the aborted robbery attempt, a young black male with a white cloth over his face, wearing a red shirt turned inside out with some letters on it and waving a .22 caliber pistol, entered the store demanding money. The young man fired the pistol so close to the clerk that a powder burn was left on the clerk's face. The clerk surrendered all the money in the cash register as well as that in his pocket to the young black, placing the money in a brown paper sack. The young male then fled the store. This robbery was promptly reported.

A few minutes later at a third all-night convenience store a few further blocks removed from the first two stores, a young black male entered asking for change to buy a drink. This accomplished, the man left the store. A few minutes later, he returned brandishing a .22 caliber pistol demanding money. The clerk was required to place all the money in his pocket and in the cash register in a red cardboard box designed to hold four six-packs of Coca-Cola. After gaining possession of the money, the robber fired the gun forcing the clerk to lie on the floor and the man fled. This young man was wearing dark shorts and was dressed in an Army-type fatigue jacket without sleeves over a red shirt. Some of the coins taken were loose and some were rolled.

Just prior to the robbery at the last store, a fireman on duty at a station near the third robbery heard several sirens. He and a companion exited the fire station, curious as to the sound. The two men drove to a point near where the first successful robbery had occurred but did not see anything. Thus, they returned to the fire station. Shortly after that the fireman was looking out the glass doors of the station and observed a man standing at the corner relieving himself.

This man sat down for a minute on a bench at the corner and then commenced to walk toward the location of the last robbery. The fireman went out onto the patio of the station and sat down. A few minutes later, he saw the first man he had seen, running back toward the station accompanied by a second man carrying a red box. He could hear the jingle of coins as the men ran. He heard the first man (apparently Sparks) call out "Fire it up!" A car was started and the fireman observed a white car with three black males drive away with a tag on the car bearing the number BRF 293. These occurrences were reported to the police (as had been all three robberies).

A second male citizen on that morning was walking from his home to a nearby store to purchase a soft drink. As he walked toward the store, he observed a man walk by in the direction of the third store that was robbed. After purchasing his drink, he returned home. On the way, he observed two men running toward him. One was the same man he had seen a few minutes earlier and the other man was dressed in a red shirt and was carrying a red box. This man reported his observations to the police and that same night was carried to a location where numerous police cars were parked. He identified two of three men at that location as being the two men he had seen earlier running toward him, one of whom was carrying a red Coca-Cola box. These two men were running toward the nearby fire station.

The Macon police received a telephonic report of three successive robberies all along the same thoroughfare. They also received a report that a white Maverick automobile containing three black males had been seen under suspicious circumstances in the area. This car had a tag number of BRF 293. Almost immediately after the reports, a cruising police patrol observed a white car fitting that description containing three black males. Upon determining that the car bore tag number BRF 293, the car was stopped and the three black males arrested. In the car was found two pistols, one being a .22 caliber similar if not identical to the one used in the robberies. Also in the car was a green fatigue shirt with the name Sparks attached to it. A red Coke box was found with some loose coins as was a brown paper bag also with loose coins. A roll of quarters was also in the car. One of the passengers had a red T-shirt with the word "Bulldog" written on it. Also found was a white cloth. The driver (Butler) was found to have $180 in his wallet. The passenger in the front seat (Collier) also was found to have $180 in his wallet. In the back seat (where Sparks had been seated when the car was stopped) was found a wad of currency amounting to $180 stuffed into the crack in the back seat.

Butler and Collier each testified for the state. Butler testified that he, Collier, and Sparks had been drinking together all day of July 5th. Late on the evening of July 5-6, Butler drove the three men in a white Maverick to a convenience store. Both Collier and Sparks

dismounted and Butler waited in the car. At the time Collier was wearing a red T-shirt with black letters with the shirt turned inside out to hide the letters. Shortly thereafter, Sparks and Collier came running back complaining that the store was locked and they could not gain admittance. Butler then drove close to a second nearby convenience store. Again Collier and Sparks dismounted. Soon thereafter, Butler heard a gun discharge and then Collier and Sparks ran up to the car. Collier was carrying a brown paper bag with money in it. They drove away to a nearby lot where Sparks divided the money equally among the three. Butler then drove to a third place close to a fire station located near to a third all-night convenience store. Collier was let out while Sparks and Butler went to get some gas. Then Butler parked the car and Sparks got out. Shortly thereafter, both Collier and Sparks ran back to the car with Collier holding a Coke box. They left and they once again equally divided the money. As they were leaving this last place after the money was separated, they were spotted by the police, stopped, and arrested. In substance Collier testified to the same facts. He added only that on each occasion Sparks had remained outside each store out of range of vision. He also testified that Sparks advised Collier to enter the store firing the pistol to show the clerk the seriousness of the demand for money. He also added that at the last store Sparks advised that Collier should scout the location by entering the store first to buy a drink and thus see if the store was clear. He was then joined by Sparks who once again waited outside while he (Collier) entered the store and robbed the manager. Prior to Sparks' trial, both Collier and Butler had entered pleas of guilty to armed robbery.

In his defense, Sparks testified that he had indeed been present with Collier and Butler in a white Maverick. However, his recollection was substantially different. He stated (with corroboration) that the three men had drunk a large quantity of beer and whiskey during the day of July 5. Late that evening the three men had gone for a drive with Butler driving, Collier in the front passenger seat, and Sparks in the rear seat. Sparks testified he went to sleep in the back seat and awoke a few moments before the car was stopped by the police, and they had been arrested. Sparks denied being involved in any robberies or having any prior knowledge that any robberies had been or were going to be committed. He challenged the veracity and motives of his two self proclaimed accomplices.

In this state a conviction based upon the testimony of an accomplice must find support by corroborating evidence. However, it is not necessary that this corroboration itself be sufficient to warrant a verdict, or that the testimony of the accomplice be corroborated in every material part. *Dixon v. State*, 116 Ga. 186 (42 SE 357); *Taylor v. State*, 110 Ga. 150 (35 SE 161). Slight evidence from an extraneous

source identifying the accused as a participant in the criminal act will be sufficient corroboration of the accomplice to support a verdict. *Evans v. State*, 78 Ga. 351; *Roberts v. State*, 55 Ga. 220. When two or more accomplices testify, the testimony of one may be corroborated by the other. *Eubanks v. State*, 240 Ga. 544, 545 (242 SE2d 41). The sufficiency of the corroboration of the testimony of the accomplice to produce conviction of the defendant's guilt is peculiarly a matter for the jury to determine. If the verdict is founded on credible evidence connecting the defendant to the crime even by virtue only of circumstantial corroboration, it cannot be said as a matter of law that the verdict is contrary to the evidence. *Birt v. State*, 236 Ga. 815, 826 (225 SE2d 248); *Felix v. State*, 143 Ga. App. 376 (238 SE2d 734). The evidence in this case both of a direct and circumstantial nature overwhelmingly connects the appellant to all three crimes charged. We find no merit in the first enumeration of error.

2. In his second enumeration, Sparks urges that the trial court erred in allowing his statement admitting presence but denying criminal participation. The grounds of this enumeration are that the *Miranda* rights were not read, and that Sparks was under the influence of intoxicants when he was questioned and the statement was not voluntary. Sparks never testified that he was unaware of his rights or that he was drunk at the time of his arrest and interrogation. He did dispute the *Miranda* warning. However, the contradictory testimony of the police was to the effect that a *Miranda* warning was given and that Sparks stated he understood those rights. Initially Sparks stated he did not want to make a statement written or otherwise, but he never requested the presence of an attorney. Subsequently when presented with copies of the statements executed by Collier and Butler, Sparks blurted out that "that was the way it was but that I was just along for a ride to get home." The officers testified that Sparks appeared fully rational and that his statement was wholly voluntary. We agree that the evidence supports the ruling of the trial court that the statement was indeed voluntary and find no error in its admission (*High v. State*, 233 Ga. 153 (210 SE2d 673)). See *Johnson v. State*, 133 Ga. App. 394 (1) (211 SE2d 20).

3. Sparks complains in his third enumeration that the trial judge erred in assessing a harsher sentence because Sparks elected to enter a plea of not guilty, thus putting the state to the trouble of proving guilt rather than entering a plea of guilty. We would agree with Sparks if we were satisfied that the trial judge was so motivated. However, as we read the transcript in this case, it is clear that the trial court was concerned with Sparks' absolute absence of remorse. Though he referred to the guilty pleas of the two accomplices, he did so only to point out that remorse and admission was a first and important step toward rehabilitation. There is no indication in the re-

marks of the trial court that the court was chagrined because the state or the court was required to spend wasted time trying a hopeless cause, though in truth the transcript reflects that indeed was the case for no real defense was forthcoming. We find no merit in this enumeration. See *Thompson v. State*, 154 Ga. App. 704, 708 (4) (269 SE2d 474).

4. In his last enumeration of error, Sparks complains the trial court erred in allowing the state to use leading questions in presenting its case in chief. In the face of these objections particularly offered during the testimony of the two accomplices, the trial court observed that the questions generally were not of a leading nature but nevertheless cautioned the prosecutor to refrain from using leading questions. Thus, even if questions were asked that were leading (which the court considered not to be), the objection in effect was sustained and counsel chastised. Moreover, assuming that the state did violate the rules of evidence in certain instances, in the face of the overwhelming quality of the evidence of guilt, we still find in the face of all the evidence presented that it is, beyond reasonable doubt, highly probable that any such error did not contribute to the finding of guilty. *Johnson v. State*, 238 Ga. 59, 61 (230 SE2d 869).

*Judgment affirmed. Sognier, J., concurs. Carley, J., concurs in Divisions 1, 2, 4, and in the judgment.*

DECIDED SEPTEMBER 12, 1985.

*Jane A. Stevens*, for appellant.
*Willis B. Sparks III, District Attorney*, for appellee.